

# ATTORNEY GENERAL OF TEXAS

### GREG ABBOTT

September 27, 2004

The Honorable Phil King
Chair, Regulated Industry Committee
Texas House of Representatives
Post Office Box 2910
Austin, Texas 78768-2910

Opinion No. GA-0252

Re: Whether the Weatherford College District may lease real property to the Wesley Foundation, an organization associated with the United Methodist Church, to construct a student center, chapel, and other facilities  (RQ-0205-GA)

Dear Representative King:

You ask whether the Weatherford College District (the "College District") may lease real property to the Wesley Foundation, an organization associated with the United Methodist Church, to construct a student center, chapel, and other facilities.[1]

## I.    Background

You explain that the Wesley Foundation, "a contemplated non-profit 501(c)3 Texas Corporation, has attempted to obtain a long-term lease agreement from Weatherford College for a portion of its lands." Request Letter, *supra* note 1, at 1.  You provide the following information about the lease and proposed facilities to be constructed on College District property:

> The long-term lease agreement is to be sufficient to accommodate the Wesley Foundation's commitment to facilitate the cost of constructing a student center including a lounge, classrooms, kitchens, and administrative offices for the Weatherford District Superintendent of the United Methodist Church.
>
> The facility to be constructed will be under the control of the Foundation, subject however to significant review and approval provisions relating to the construction plans. The center is to be non-denominational, and while a Chapel is contemplated, the facilities' primary use will be to provide another venue for Weatherford College students' social and educational experiences.  It is additionally

---

[1]Letter from Honorable Phil King, Chair, Regulated Industry Committee, Texas House of Representatives, to Honorable Greg Abbott, Texas Attorney General (Apr. 6, 2004) (on file with the Opinion Committee, *also available at* http://www.oag.state.tx.us) [hereinafter Request Letter].

> contemplated that the Foundation will build excess parking which
> will immediately be used by the College and at the end of the lease
> term the facility will revert to or pass to Weatherford College.

*Id.* at 1. Although you do not provide any information about the Wesley Foundation's purpose or nature, we gather that it is an organization of or associated with the United Methodist Church. We assume that the student center would be open to all students and that the chapel would be nondenominational.

We understand from newspaper reports that the lease would be for up to a 50-year term and that the Wesley Foundation would pay the College District $1.00 a month for the use of the property. *See Fort Worth Area Briefs, Weatherford,* THE FORT WORTH STAR TELEGRAM, Feb. 20, 2004 ("The Weatherford College board has authorized the college to move forward with an agreement with the Wesley Foundation to lease college-owned land for the construction of a student center. The agreement calls for the foundation to pay $1 a month for 50 years for use of the property."); *see also* Gale M. Bradford, *Weatherford College trustees table church group's lease plan,* THE FORT WORTH STAR TELEGRAM, Jan. 15, 2004. It is not clear from your letter or the newspaper reports whether the entire facility or only the excess parking would revert to the College District. *See* Request Letter, *supra* note 1, at 1.

You ask two very general questions about the lease:

1.    Does current Texas law prohibit Weatherford College from leasing all or a portion of its lands to any entity, including without limitation a 501(c)3 non-profit entity?

2.    If permitted, does the non-profit entity's religious affiliation prohibit such a lease agreement as generally outlined in the facts set forth above?

*Id.* at 1-2. Your first question requires us to determine whether the College District is authorized to lease real property to a private entity and then to examine the common-law, statutory, and constitutional limitations on that authority. Your second question requires us to consider more particularly whether the College District may lease real property to a religious organization.

## II.    Weatherford College District's Authority to Lease Real Property to a Private Entity

### A.    A Junior College District's Statutory Authority to Lease Property

The College District is a junior college district governed by chapter 130 of the Education Code. *See* TEX. EDUC. CODE ANN. § 130.209 (Vernon 2002) (establishing the Weatherford College District service area). Chapter 130 provides that "Texas public junior colleges shall be two-year institutions primarily serving their local taxing districts and service areas in Texas and offering vocational, technical, and academic courses for certification or associate degrees." *Id.* § 130.0011. Section 130.003(e) establishes that the purpose of each public community college shall be to provide

> (1) technical programs up to two years in length leading to associate degrees or certificates;
>
> (2) vocational programs leading directly to employment in semi-skilled and skilled occupations;
>
> (3) freshman and sophomore courses in arts and sciences;
>
> (4) continuing adult education programs for occupational or cultural upgrading;
>
> (5) compensatory education programs designed to fulfill the commitment of an admissions policy allowing the enrollment of disadvantaged students;
>
> (6) a continuing program of counseling and guidance designed to assist students in achieving their individual educational goals;
>
> (7) work force development programs designed to meet local and statewide needs;
>
> (8) adult litcracy and other basic skills programs for adults; and
>
> (9) such other purposes as may be prescribed by the Texas Higher Education Coordinating Board or local governing boards in the best interest of post-secondary education in Texas.

*Id.* § 130.003(e).

The Texas Higher Education Coordinating Board ("Coordinating Board") exercises "general control of the public junior colleges of this state," *id.* § 61.060 (Vernon 1996); *see also id.* § 130.001(a) (Vernon 2002) ("The Coordinating Board . . . shall exercise general control of the public junior colleges of Texas."), and is generally required to approve building construction at institutions of higher education financed from any source, *see id.* § 61.058(a) (Vernon Supp. 2004). However, the Coordinating Board's authority to approve or disapprove new construction on junior college district property does not extend to construction on land leased to a private entity that does not involve state funding. *See id.* § 61.058(a)(E) ("the requirement of approval by the board does not apply to a junior college's construction, repair, or rehabilitation financed entirely with funds from a source other than the state, including funds from ad valorem tax receipts of the college, gifts, grants, and donations to the college, and student fees"), (F) ("[T]he requirement of approval by the board does not apply to construction, repair, or rehabilitation of privately owned buildings and facilities located on land leased from an institution of higher education if the construction, repair, or rehabilitation is financed entirely from funds not under the control of the institution, . . . provided that: (i) the buildings and facilities are to be used exclusively for auxiliary enterprises; and (ii) the buildings and facilities will not require appropriations from the legislature for operation, maintenance, or repair unless approval by the board has been obtained.").

Authority not vested in the Coordinating Board "is reserved and retained locally in each of the respective public junior college districts or in the governing boards of such junior colleges as provided in the laws applicable." *Id.* § 130.002 (Vernon Supp. 2004); *see also id.* § 61.060 (Vernon 1996) ("All authority not vested by this chapter or other laws of the state in the board is reserved and retained locally in each respective public junior college district or the governing board of each public junior college as provided in the applicable laws."). A junior college district board of trustees is "governed in the establishment, management and control of the junior college by the general law governing the establishment, management and control of independent school districts insofar as the general law is applicable." *Id.* § 130.084 (Vernon 2002). Section 130.0021 governs a junior college district's authority to donate, exchange, convey, sell, or lease land to a university system. *See id.* § 130.0021.[2] Because no other chapter 130 provision governs the authority of a junior college district to convey land,[3] we look to the law applicable to independent school districts' authority to lease school district land. *See id.* § 130.084.

The trustees of an independent school district "as a body corporate have the exclusive power and duty to govern and oversee the management of the public schools of the district." *Id.* § 11.151(b) (Vernon Supp. 2004). Under section 11.151(a) of the Education Code, the trustees of an independent school district "in the name of the district may acquire and hold real and personal property, sue and be sued, and receive bequests and donations or other moneys or funds coming legally into their hands." *Id.* § 11.151(a). In addition, section 11.151(c) provides that "[a]ll rights and titles to the school property of the district, whether real or personal, shall be vested in the trustees and their successors in office. The trustees may, in any appropriate manner, dispose of property that is no longer necessary for the operation of the school district." *Id.* § 11.151(c). Section 11.154(a) further provides that a "board of trustees of an independent school district may, by resolution, authorize the sale of any property, other than minerals, held in trust for public school purposes." *Id.* § 11.154 (Vernon 1996). A board of trustees holds school property in trust to be used for the benefit of school children in the district. *See Love v. City of Dallas*, 40 S.W.2d 20, 29 (Tex. 1931).

---

[2]Section 130.0021 provides that "[a] public junior college or a public junior college district may donate, exchange, convey, sell, or lease land, improvements, or any other interest in any real property for less than the fair market value of the real property interest if the donation, conveyance, exchange, sale, or lease is being made to a university system and the governing board of the public junior college or the public junior college district also finds that the donation, conveyance, exchange, sale, or lease of the interest promotes a public purpose related to higher education within the service area of the public junior college or the public junior college district." TEX. EDUC. CODE ANN. § 130.0021 (Vernon 2002).

[3]By contrast, provisions governing public senior colleges expressly authorize their governing boards to convey land. *See, e.g., id.* §§ 65.39 ("The board of regents of The University of Texas System has the sole and exclusive management and control of the lands set aside and appropriated to, or acquired by, The University of Texas System. The board may sell, lease, and otherwise manage, control, and use the lands in any manner and at prices and under terms and conditions the board deems best for the interest of The University of Texas System, not in conflict with the constitution."), 85.25(b) ("The board [of regents of The Texas A&M University System] may grant, sell, lease, or otherwise dispose of the lands and mineral interests under its jurisdiction that do not comprise any portion of the original main campus of Texas A&M University to other units or agencies of government, or to any individual, group of individuals, corporation, or other entity under terms and conditions it deems best in the public interest."), (c) ("Except as authorized by existing law, any grant, sale, or lease of the surface estate of the original main campus property must be approved by Act of the legislature.").

While sections 11.151(c) and 11.154 authorize a board of trustees to dispose of real property that is no longer necessary for the operation of the school district and to sell property, no provision expressly authorizes a board of trustees to lease school real property to another entity. However, in *Royse Independent School District v. Reinhardt*, 159 S.W. 1010 (Tex. Civ. App.–Dallas 1913, writ ref'd), the court concluded that a board of trustees' statutory authority impliedly authorizes a board to lease school real property to another entity. In that case, the court held that the board's exclusive power to manage and control school property included the power to lease a school baseball field to the Royse Booster Club during summer months for a three-year term in exchange for the club's agreement to make certain improvements to the property. The court observed that "[t]he primary object in granting the privilege to the Royse Booster Club to use its school grounds as a place to play baseball is to subserve a public purpose, and not to promote some private end." *Id.* at 1011. Moreover, it concluded that the lease would not harm the property or interfere with school activities, given that it was limited to the summer months, and would "result in quite a financial advantage to the school district." *Id.*

Based on these facts, the court concluded that "such use [of the property] is not so inconsistent with the purposes to which the property has been dedicated or set apart as renders the contract . . . illegal or unauthorized." *Id.* Relying on *Royse*, a number of attorney general opinions have recognized boards of trustees' implied authority to permit private groups to lease school property when the lease does not interfere with the property's school purpose. *See, e.g.*, Tex. Att'y Gen. Op. Nos. WW-1364 (1962) at 7 (concluding that a school district board of trustees was authorized to lease school property to a fire protection district so long as the lease "does not impede or interfere with the operation of the school"); O-5354 (1943) at 9 (concluding that a school district board of trustees was authorized to lease a school building to a religious sect for a summer religious school provided that the school district received reasonable consideration and the lease did not "interfere[] with use of such property for school purposes"). *Cf.* Tex. Att'y Gen. Op. No. JM-531 (1986) (addressing a school district's authority to lease for a 50-year term undeveloped land that it did not plan to use for instructional purposes).

While judicial and attorney general opinions after *Royse* have not questioned school district boards of trustees' implied authority to lease school district land, it is important to note that subsequent opinions addressing long-term leases have concluded that boards of trustees lack authority to enter into a lease that interferes with the property's use for school purposes or that relinquishes the board's authority to control the property's use. For example, in 1972 this office concluded that an independent school district lacked authority to lease school property for use as a neighborhood center for a 20-year term:

> [A] minimum twenty-year lease by the present trustees of the property in question, without any discretion being left in the trustees of the future for possible needed use for school purposes, would exceed the recognized discretionary leasing authority of the school . . . . The lease would not be deemed a temporary, casual, or incidental use and would amount to an impermissible diversion of governmental property from its intended use for school purposes.

Tex. Att'y Gen. Op. No. M-1047 (1972) at 3.

And even more significantly, in 1986, in the last judicial opinion to consider a school district lease's validity, the court declared the lease ultra vires and void. *See River Rd. Neighborhood Ass'n v. S. Tex. Sports*, 720 S.W.2d 551, 559-60 (Tex. App.–San Antonio 1986, writ dism'd). In that case, the court considered a school district's authority to lease a football stadium to a private entity, STS, according to terms described in part as follows:

> The lease is for a primary term of 30 years and grants to lessee, STS, the right to extend the term for two additional 10-year periods. The lease is, thus, for a minimum period of 30 years, and if STS chooses to exercise its options, for an additional 20 years.
>
> The lease gives STS the right to the "exclusive use" of the leased premises for "all lawful purposes," without paying until at least February 1, 1986.

*Id.* at 559. The plaintiffs did not question the district's right to permit a private organization to use district property in a manner that would not interfere with the property's use for school district purposes, but contended that the lease relinquished the board's right to manage and control the property, including its right to allow other groups to use the property. *Id.* The court agreed:

> There can be no doubt that [the] District's Board exceeded its powers when it, by the lease in question, effectively divested itself of the exclusive right to manage and control the property in question, including, for a period of perhaps 50 years, the exclusive right to determine when the District itself could use the school property for school purposes. The invalidity of such abdication of power and diversion of property held for public purposes has been recognized in Texas at least since 1887.

*Id.* at 560.

In sum, the College District board of trustees has implied authority under the Education Code to lease district real property to a private entity. However, in leasing district property, the College District board of trustees may not (i) permit uses of the property that would interfere with the property's use for district purposes, or (ii) divest itself of the exclusive right to manage and control the property in question. The final determination whether a lease comports with these limitations involves questions of fact, *see* Tex. Att'y Gen. Op. No. JM-531 (1986) at 2 (a question whether a school district's agreement to lease school district land for a 50-year term interfered with the property's school district use and the board's authority "is essentially a question of fact"), and contract interpretation, and is thus beyond the purview of an attorney general opinion, *see* Tex. Att'y Gen. Op. Nos. GA-0176 (2004) at 2 (attorney general opinions may "address a public entity's authority to agree to a particular contract term, if the question can be answered as a matter of law" but do not construe contracts); GA-0078 (2003) at 2 (same). *See generally* Tex. Att'y Gen. Op. Nos. GA-0128 (2003) at 5 (a question requiring resolution of particular facts is "not one in which this office ordinarily engages in the opinion process"); GA-0106 (2003) at 7 ("This office cannot find

facts or resolve fact questions in an attorney general opinion."). Based on the facts provided, however, we caution that the College District may not divest itself of the right to manage and control campus facilities constructed under the lease. *See* Request Letter, *supra* note 1, at 1 (stating that "[t]he facility to be constructed will be under the control of the Foundation"). In addition, while the proposed excess parking, student center, and nondenominational chapel, essentially new campus facilities, do not appear to interfere with the property's use for district purposes, it is less apparent that using a campus facility to house a private entity's district administrative offices would not interfere with the property's use for district purposes. *See id.* (noting that the campus facility to be constructed under the lease would house "administrative offices for the Weatherford District Superintendent of the United Methodist Church"). We suggest that the College District board of trustees consider and make express findings regarding whether the uses of the property under the proposed lease would interfere with the property's use for district purposes.

### B.     Other Limitations on a Junior College District's Authority to Lease Land to a Private Entity

State statutes and the Texas Constitution impose additional limitations on the authority of a junior college district to lease real property to a private entity.

#### i.      Section 272.001 of the Local Government Code

First, in some instances a long-term lease by a political subdivision may constitute a sale subject to section 272.001 of the Local Government Code. Section 272.001 governs the authority of political subdivisions, including junior college districts, to sell or exchange land or interests in land, generally requiring a political subdivision to provide notice and to obtain bids. *See* TEX. LOC. GOV'T CODE ANN. § 272.001 (Vernon Supp. 2004); Tex. Att'y Gen. LO-97-076, at 3 (concluding that a junior college district is a political subdivision subject to Local Government Code, section 272.001).

Section 272.001(a) requires that "before land owned by a political subdivision of the state may be sold or exchanged for other land, notice to the general public of the offer of the land for sale or exchange must be published in a newspaper of general circulation," with information about sealed bidding procedures. *See* TEX. LOC. GOV'T CODE ANN. § 272.001(a) (Vernon Supp. 2004). Section 272.001(b) excepts certain types of land and interests from the section 272.001(a) notice and bidding requirements, including "land that the political subdivision wants to have developed by contract with an independent foundation." *Id.* § 272.001(b)(4). As this office has previously advised the College District, "any contract of sale under the terms of Local Government Code section 272.001(b)(4) between a political subdivision and a private foundation for the development of a parcel of public land owned by the political subdivision must include an undertaking that the foundation will develop the land as the political subdivision determines." Tex. Att'y Gen. LO-97-076, at 3. The land and interests described by 272.001(b), including section 272.001(b)(4), "may not be conveyed, sold, or exchanged for less than the fair market value of the land or interest unless the conveyance, sale, or exchange is with one or more abutting property owners who own the underlying fee simple." TEX. LOC. GOV'T CODE ANN. § 272.001(b) (Vernon Supp. 2004).

Whether a lease arrangement is a sale or exchange subject to section 272.001 depends upon the lease's terms, such as the lease's duration, the political subdivision's right to control the land during the lease term, and the political subdivision's right to improvements at termination. *See* Tex. Att'y Gen. LO-96-053, at 3 (noting that a court could "conclude that a transaction in which a county transfers equitable title to county real property to another entity with an irrevocable option to purchase constitutes a sale of land for purposes of section 272.001"). A court of appeals recently concluded that section 272.001 does not apply when a political subdivision temporarily leases land to a private entity. *See Walker v. City of Georgetown*, 86 S.W.3d 249, 259 (Tex. App.–Austin 2002, pet. denied). In that case, the court found that "there was no permanent disposition of land. The City of Georgetown entered into a ten-year lease, with a ten-year renewal option, during which the City retains significant control over the use of the property. Upon termination of the lease, if renewed, the City will acquire the batting cages [built on city property by the private lessee]." *Id.* at 258. Based on the limited information provided about the lease terms, this office cannot determine whether the proposed lease at issue here would constitute a permanent disposition of land subject to section 272.001. *See* Tex. Att'y Gen. LO-96-053, at 3 ("the determination whether a particular lease-purchase agreement constitutes a sale [subject to section 272.001] would involve questions of fact and contract interpretation and is therefore beyond the scope of an attorney general opinion"); *see also supra* p. 2 (noting that it is unclear whether all the facilities constructed under the lease would revert to the College District).

### ii.    *Article III, section 52(a) of the Texas Constitution*

Second, article III, section 52(a) of the Texas Constitution limits the authority of a political subdivision to aid a private entity. It provides as follows:

> Except as otherwise provided by this section, the Legislature shall have no power to authorize any county, city, town or other political corporation or subdivision of the State to lend its credit or to grant public money or thing of value in aid of, or to any individual, association or corporation whatsoever, or to become a stockholder in such corporation, association or company.

TEX. CONST. art. III, § 52(a).

Section 52(a) prohibits "gratuitous payments to individuals, associations, or corporations," but "[a] political subdivision's paying public money is not 'gratuitous' if the political subdivision receives return consideration." *Tex. Mun. League Intergovernmental Risk Pool v. Tex. Workers' Comp. Comm'n*, 74 S.W.3d 377, 383 (Tex. 2002). With the exception of gratuitous transactions, which are absolutely prohibited, a political subdivision's use of funds or "thing of value" that aids a private entity must serve a "public purpose" to pass constitutional muster. As the Supreme Court of Texas has recently held, in order to comport with article III, section 52(a), the predominant purpose of a statute requiring a public expenditure must be to accomplish a public purpose, not to benefit private parties, and the statute must impose public control over the funds to ensure that the public purpose is accomplished and to protect the public's investment and ensure that the political subdivision receives a return benefit. *See id.* at 383-84. This office has identified similar principles

for determining if a particular expenditure serves a public purpose: "In making an expenditure of [public] funds that benefits a private person or entity, . . . a [political subdivision's governing body] will avoid violating article III, section 52 if it (i) determines in good faith that the expenditure serves a public purpose and (ii) places sufficient controls on the transaction, contractual or otherwise, to ensure that the public purpose is carried out." Tex. Att'y Gen. Op. Nos. GA-0188 (2004) at 4, GA-0078 (2003) at 4 (citing *Young v. City of Houston*, 756 S.W.2d 813, 814 (Tex. App.–Houston [1st Dist.] 1988, writ denied); *City of Coleman v. Rhone*, 222 S.W.2d 646, 649 (Tex. Civ. App.–Eastland 1949, writ ref'd)).

The College District is a political subdivision, *see* Tex. Att'y Gen. Op. No. M-707 (1970) at 3, and its agreement to permit a private entity to use its land constitutes a "thing of value" for purposes of article III, section 52(a), *see Walker*, 86 S.W.3d at 260 (addressing whether city's lease of park land to private company violated article III, section 52(a)); Tex. Att'y Gen. Op. Nos. GA-0084 (2003) at 9 (addressing whether a city lease agreement with a volunteer firefighters association violated article III, section 52(a)), JC-0582 (2002) at 5-6 (addressing whether a county lease agreement with a museum violated article III, section 52(a)). Thus, a College District lease to a private entity must satisfy the public purpose test. *See, e.g.*, Tex. Att'y Gen. Op. Nos. GA-0084 (2003) at 8 (applying the public purpose test to a city lease agreement with a volunteer firefighters association), JC-0582 (2002) at 4 (applying the public purpose test to a county lease agreement with a museum).

Here, the College District proposes to lease district property to a private entity for a 50-year term for $1 a month. But the College District may receive other more meaningful consideration, such as the construction and use of a student center, classrooms, and parking facilities. While the lease would be prohibited by section 52(a) if the College District receives no or merely nominal return consideration, this does not appear to be the case. *See Tex. Mun. League Intergovernmental Risk Pool*, 74 S.W.3d at 384 (suggesting that article III, section 52 "requires only sufficient–not equal–return consideration"); *see also Walker*, 86 S.W.3d at 260 ("[T]he lease entered into here was supported by valuable consideration. As such, it was not a gratuitous donation of public funds or a thing of value."). Assuming that the College District would receive more than nominal return consideration, section 52(a) does not prohibit the lease if the College District's board of trustees determines in good faith that the proposed lease serves a public purpose of the College District, *see* Tex. Att'y Gen. Op. No. GA-0078 (2003) at 4, and includes in the lease sufficient controls to ensure that the public purpose is carried out, *see id.* at 4-5.

### III.      Weatherford College District's Authority to Lease Real Property to a Religious Organization

Your second question asks, if the College District is permitted to lease land to a private nonprofit entity, whether "the non-profit entity's religious affiliation prohibit[s] such a lease agreement as generally outlined in the facts set forth above?" Request Letter, *supra* note 1, at 1-2. No statute specifically addresses the College District's authority to lease real property to a religious organization or affiliate. Thus we consider whether the United States or Texas Constitution prohibits such a lease given "the non-profit entity's religious affiliation." *Id.*

## A.    The United States Constitution

The Establishment Clause of the First Amendment to the United States Constitution provides in pertinent part that "Congress shall make no law respecting an establishment of religion," and applies to the states and their political subdivisions through the Fourteenth Amendment. *See Everson v. Board of Educ.*, 330 U.S. 1, 14 (1947); *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). The Establishment Clause ensures government neutrality toward religion. *See Wallace v. Jaffree*, 472 U.S. 38, 60 (1985). Government cannot favor religion over nonreligion, and it cannot favor one religion over another. *See Epperson v. Arkansas*, 393 U.S. 97, 103-04 (1968); *Sch. Dist. of Abington Tp. v. Schempp*, 374 U.S. 203, 217, 226 (1963). At the same time, government may not be hostile toward religion, for that would show a preference for nonbelief over belief. *See Zorach v. Clauson*, 343 U.S. 306, 314 (1952) ("[The Constitution does not require that] the government show a callous indifference to religious groups. That would be preferring those who believe in no religion over those who do believe. . . . [W]e find no constitutional requirement which makes it necessary for government to be hostile to religion and to throw its weight against efforts to widen the effective scope of religious influence.").

The United States Court of Appeals for the Fifth Circuit has gleaned from United States Supreme Court precedent three different tests used to determine whether governmental action violates the Establishment Clause. *See Freiler v. Tangipahoa Parish Bd.*, 185 F.3d 337, 343 (5th Cir. 1999), *cert. denied*, 530 U.S. 1271 (2000); *see also Briggs v. Mississippi*, 331 F.3d 499, 505 (5th Cir. 2003), *cert. denied*, 124 S. Ct. 1070 (2004). First, under the test set forth in *Lemon v. Kurtzman*, "a state practice is unconstitutional if (1) it lacks a secular purpose; (2) its primary effect either advances or inhibits religion; or (3) it excessively entangles government with religion." *Freiler*, 185 F.3d at 343 (citing *Lemon v. Kurtzman*, 403 U.S. 602 (1971)); *see also Van Orden v. Perry*, 351 F.3d 173, 177 (5th Cir. 2004), *petition for cert. filed*, 72 U.S.L.W. 3718 (U.S. Mar. 31, 2004) (No. 03-1500) ("In its thirty-two year life, *Lemon v. Kurtzman* has been criticized but remains a required starting point in deciding contentions that state displays of symbols and writings with a religious message are contrary to the First Amendment."); *Williams v. Lara*, 52 S.W.3d 171, 189-90 (Tex. 2001) (applying the *Lemon* test although it "has been criticized by a majority of the current justices, and the Court has used other analyses in attempting to achieve the First Amendment's underlying purpose"). Second, the United States Supreme Court has refined the older *Lemon* test with the "endorsement test," which "seeks to determine whether the government endorses religion by means of the challenged action." *Freiler*, 185 F.3d at 343. Third, "the coercion test" "analyzes school-sponsored religious activity in terms of the coercive effect that the activity has on students." *Id.* Because the proposed lease does not appear to require student participation in any formal religious activity, the coercion test is not relevant here. *See id.* at 344 ("The decision to apply a particular Establishment Clause test rests upon the nature of the Establishment Clause violation asserted. Where, as in the instant action, the practice at issue does not direct student participation in a formal religious exercise, we elect not to apply the coercion test.").

We have not located any Establishment Clause case examining whether a public school district, college, or university may lease land to a religious organization to construct campus improvements. We have located several cases that examine whether a political subdivision may sell or lease real property to a religious organization to operate or construct a religious sanctuary or other

improvements. *See, e.g., Freedom from Religion Found., Inc. v. City of Marshfield*, 203 F.3d 487 (7th Cir. 2000) (a city's sale to a private fund of city property containing a religious statue was not government action endorsing religion in violation of the Establishment Clause); *Hawley v. City of Cleveland*, 24 F.3d 814 (6th Cir. 1994) (a city's lease of space in its airport for a chapel did not violate the Establishment Clause); *Southside Fair Housing Comm. v. City of New York*, 928 F.2d 1336 (2d Cir. 1991) (a city's sale of land to a Hasidic congregation did not violate the Establishment Clause); *Brashich v. Port Auth. of New York and New Jersey*, 791 F.2d 224 (2d Cir. 1980) (leasing airport property to three religious groups to construct chapels did not violate the Establishment Clause); *Utah Gospel Mission v. Salt Lake City Corp.*, 316 F. Supp.2d 1201 (D. Utah 2004) (a city's sale of a pedestrian easement to a church did not violate the Establishment Clause); *Woodland Hills Homeowners Org. v. Los Angeles Cmty. Coll. Dist.*, 266 Cal. Rptr. 767 (Cal. App. 1990) (a college district's long-term lease of land to a religious congregation to build a synagogue did not violate the Establishment Clause).

It is clear from these cases that courts apply the Establishment Clause tests in light of each situation's unique facts, and a court's decision in any particular case is extremely fact sensitive. We examine the proposed lease in light of this case law to provide the College District with guidance. Given the limited information available to us about the proposed lease, however, we cannot ultimately determine how a court would view the College District's proposed action, should it be challenged in a legal action. *See* Tex. Att'y Gen. Op. Nos. GA-0128 (2003) at 5 (a question requiring resolution of particular facts is "not one in which this office ordinarily engages in the opinion process"), GA-0106 (2003) at 7 ("This office cannot find facts or resolve fact questions in an attorney general opinion."); *see also* Tex. Att'y Gen. LO-97-018 at 7 ("Because the determination whether the installation of a Latin cross by a county as a traffic fatality marker violates the Establishment Clause would require resolution of questions of fact, it is ultimately beyond the purview of an attorney general opinion.").

Applying the *Lemon* test, courts generally defer to a government's statement of secular purpose. *See Edwards v. Aguillard*, 482 U.S. 578, 586-87 (1987). Moreover, courts do not require that the challenged state action have an exclusive, or even predominant, secular objective. *See Freiler*, 185 F.3d at 344; *see also, e.g., Lynch v. Donnelly*, 465 U.S. 668 (1984); *Lara*, 52 S.W.3d at 190 ("[I]f both religious and secular objectives motivate the government's practice, the practice does not violate the Establishment Clause as long as the government's avowed purpose is sincere."). The College District has not provided this office with briefing. Based on the facts provided in your letter, however, the College District could assert facts to demonstrate that the proposed lease has a secular purpose. Although the proposed lessee is a religiously affiliated institution, the lessee would construct campus facilities—a student center, which would include a lounge, classrooms, and kitchens, for general student use, a nondenominational chapel, and excess parking, which the College District would be permitted to use and which would revert to the College District at the end of the lease term. *See* Request Letter, *supra* note 1, at 1 (stating that the "facilities' primary use will be to provide another venue for Weatherford College students' social and educational experiences" and that the Foundation "will build excess parking which will immediately be used by the College and at the end of the lease term the facility will revert to or pass to Weatherford College"); *see also Hawley*, 24 F.3d at 822 (concluding that an airport chapel "serves the secular purpose of accommodating the religious needs of travellers and providing them with a place for rest and

comfort"); *Utah Gospel Mission,* 316 F. Supp.2d at 1245 (concluding that the city's economic gain in selling an easement to a church supported the finding that the transaction did not lack a secular purpose); *Los Angeles Cmty. Coll. Dist.,* 266 Cal. Rptr. at 775 (concluding that financial gain from surplus property was the primary, secular purpose of the college district's lease of land to a religious organization).

The second prong of the *Lemon* test—whether the government action's primary effect either advances or inhibits religion—and the endorsement test involve similar concerns, and we address them together. *See Lara,* 52 S.W.3d at 190 ("whether the challenged government practice purposefully or effectively 'endorses' religion [is] an inquiry courts generally consider a component of the *Lemon* test's first and second parts"). As the Fifth Circuit has stated, the second prong asks whether, irrespective of a governmental entity's actual purpose, "the practice under review in fact conveys a message of endorsement or disapproval." *Doe v. Santa Fe Indep. Sch. Dist.,* 168 F.3d 806, 817 (5th Cir. 1999). Under either the second *Lemon* prong or the endorsement test, the United States Supreme Court has cautioned that a government practice may not aid one religion, aid all religions, or favor one religion over another. *See, e.g., County of Allegheny v. ACLU,* 492 U.S. 573, 605 (1989) ("Whatever else the Establishment Clause may mean (and we have held it to mean no official preference even for religion over nonreligion), it certainly means at the very least that government may not demonstrate a preference for one particular sect or creed (including a preference for Christianity over other religions)." (citation omitted)); *Wallace,* 472 U.S. at 70 (O'Connor, J., concurring in judgment) ("the prohibition against governmental endorsement of religion 'preclude[s] government from conveying or attempting to convey a message that religion or a particular religious belief is favored or preferred'"); *Zorach,* 343 U.S. at 314 ("The government must be neutral when it comes to competition between sects."). On the other hand, where the benefit to religion or to a church is no more than indirect, remote, or incidental, the Supreme Court has advised that "no realistic danger [exists] that the community would think that the [contested government practice] was endorsing religion or any particular creed." *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.,* 508 U.S. 384, 395 (1993).

Here, the College District would lease land to the Wesley Foundation for $1 a month for a 50-year term, a benefit that appears to be more than indirect, remote, or incidental. Assuming that the College District benefits from the lease's terms, however, the fact that the Wesley Foundation is also benefitted does not necessarily bar the transaction. *See Southside Fair Housing Comm.,* 928 F.2d at 1351 (concluding that the effect of a city's sale of land to a Hasidic congregation at fair market value was not to advance Hasidic Judaism); *Utah Gospel Mission,* 316 F. Supp.2d at 1242 ("The Constitution does not bar the government from selling property to religious organizations under mutually advantageous terms."). *But see Annunziato v. New Haven Bd. of Aldermen,* 555 F.Supp. 427, 433 (D. Conn. 1982) (finding that city's sale of property to a church for $1 constitutes a gift of the remainder of the fair market value in violation of the Establishment Clause).

The overall effect of the lease will depend upon facts not provided in your letter, particularly the extent to which the proposed facilities would be associated with the Wesley Foundation or the United Methodist Church and the College District's past practice and general policies with respect to leasing land to private groups. *See, e.g., Southside Fair Housing Comm.,* 928 F.2d at 1350-51 ("[U]nder a neutral system that was designed to develop urban renewal land, it just so happened that

one particular group had the resources to take advantage of development opportunities.  That does not constitute a violation of the first amendment. . . . This would be a much closer case if the City had sold, for example, every single parcel of urban renewal land in Brooklyn to the Satmars for development of religious institutions.").  Without this information we cannot assess whether the lease or the proposed facilities would demonstrate a preference for the Wesley Foundation or the United Methodist Church over other religious groups or for sectarian organizations over nonsectarian organizations.  Assuming, however, that the student center will be open to all students and the chapel will be nondenominational and that the College District has leased land or campus facilities to other sectarian and nonsectarian organizations, or has neutral policies that would permit such leases in the future, the College District could assert facts to demonstrate that the proposed lease would not impermissibly advance or endorse the Wesley Foundation or the United Methodist Church.  *See Rosenberger v. Rector and Visitors of Univ. of Virginia*, 515 U.S. 819, 839 (1995) (The government program's neutrality is a "significant factor in upholding [it] in the face of Establishment Clause attack . . . . [T]he guarantee of neutrality is respected, not offended, when the government, following neutral criteria and evenhanded policies, extends benefits to recipients whose ideologies and viewpoints, including religious ones, are broad and diverse."); *see also Los Angeles Cmty. Coll. Dist.*, 266 Cal. Rptr. at 776 ("[T]he District's actions did not violate constitutional standards by granting the Congregation exclusive use of the property for a long term.  The evidence established that religious and secular groups had equal opportunity to obtain the government benefit.").

Furthermore, assuming the College District has adopted neutral policies regarding access to campus land and facilities, the fact that the Wesley Foundation, students, or other religious groups may use the leased land for religious expression is not constitutionally problematic.  The Supreme Court has consistently sustained against Establishment Clause challenge neutral government policies that permit private religious speech on and within state educational and other properties on the same terms as private secular speech is permitted.  *See, e.g., Rosenberger*, 515 U.S. 819 (holding that a university could pay the publication expenses of a student Christian newspaper in accordance with its general policy of funding student newspapers); *Lamb's Chapel*, 508 U.S. 384 (1993) (holding that a school could allow after-hours access to its facilities to a religious group when the school had made its facilities generally available to a wide variety of public organizations); *Widmar v. Vincent*, 454 U.S. 263 (1981) (holding that a university could allow a student religious group to use university facilities that were generally available for activities of student groups).

Finally, the proposed lease need not entangle the College District in the Wesley Foundation or United Methodist Church's religious affairs.  The College District must continue to exercise authority over the leased land because state law precludes the College District from divesting itself of the exclusive right to manage and control the property and because the Texas Constitution mandates that the lease serve a public purpose and that the College District include sufficient controls in the lease to ensure that the public purpose is carried out.  *See* Part II, *supra*.  But the College District, in its role as lessor, may exercise the requisite level of control over the land's development and use without involving itself in religious matters.  *See, e.g., Los Angeles Cmty. Coll. Dist.*, 266 Cal. Rptr. at 776 ("[Under] the terms of the lease, the District has authority to review the Congregation's financial capabilities and plans to alter, remodel or improve the parcel.  These administerial [sic] rights of a landlord, however, do not cause impermissible entanglement in the religious affairs of the Congregation.").

In sum, the Establishment Clause does not prohibit the College District from leasing land to a nonprofit entity because of its religious affiliation. Whether the lease comports with the Establishment Clause depends upon the totality of the facts and cannot be resolved here.

## B.     The Texas Constitution

Nor does the Texas Constitution prohibit the lease agreement on the basis of the nonprofit entity's religious affiliation. Article I, section 6 of the Texas Constitution provides as follows:

> All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences. No man shall be compelled to attend, erect or support any place of worship, or to maintain any ministry against his consent. No human authority ought, in any case whatever, to control or interfere with the rights of conscience in matters of religion, and *no preference shall ever be given by law to any religious society or mode of worship.* But it shall be the duty of the Legislature to pass such laws as may be necessary to protect equally every religious denomination in the peaceable enjoyment of its own mode of public worship.

TEX. CONST. art. I, § 6 (emphasis added). Article I, section 7 provides: "No money shall be appropriated, or drawn from the Treasury for the benefit of any sect, or religious society, theological or religious seminary; nor shall property belonging to the State be appropriated for any such purposes." *Id.* § 7.

Very few judicial opinions have addressed these state constitutional provisions. The Texas Supreme Court recently stated that these state constitutional provisions are equivalent to the federal Establishment Clause, suggesting that they impose identical limitations on government action. *See Lara*, 52 S.W.3d at 186 ("Our state constitution guarantees protections similar to those provided by the federal constitution: [quoting article I, sections 6 and 7]. Together, these provisions are considered Texas' equivalent of the Establishment Clause."). This statement suggests that the Texas Constitution imposes the same standards as the federal Establishment Clause. Thus, to comport with article I, sections 6 and 7, a governmental action must comport with the Establishment Clause.

In addition, we note that the few attorney general opinions addressing the article I, section 7 ban on appropriations of funds and property for sectarian purposes suggest that these provisions do not prohibit the College District from leasing land to the Wesley Foundation for reasonable consideration or from permitting the Foundation to build a nondenominational chapel on campus with private funds. Specifically, this office has opined that the article 1, section 7 ban on appropriations to religious organizations does not prohibit a school district from leasing a school building to a religious group provided that the lease does not interfere with the use of the property for school purposes and that "the school district receives a quid pro quo," or "reasonable consideration," "in return for the use of its property." Tex. Att'y Gen. Op. No. O-5354 (1943) at 9 (addressing a school district's lease of a school building to a religious sect for a summer religious

school). The determination whether consideration is reasonable is a matter within the discretion of the school district's board of trustees. *See id.* With respect to religious buildings on a public campus, this office has concluded that article I, section 7 does not prohibit a public college from building a nondenominational chapel on campus provided that it does so with private funds. *See* Tex. Att'y Gen. Op. Nos. WW-1269 (1962) at 6 (article I, section 7 did not prohibit the University of Houston from building with donated funds a nondenominational religious center), V-940 (1949) at 3 (article I, section 7 did not prohibit the West Texas State College from building with donated funds a nondenominational chapel); *see also* Tex. Att'y Gen. Op. No. H-1087 (1977) at 3 (concluding that a hospital district could build a nondenominational chapel with donated funds and maintain it without violating article I, sections 6 and 7).

In sum, article I, sections 6 and 7 do not prohibit the lease agreement on the basis of the nonprofit entity's religious affiliation. To comport with these provisions, the proposed lease arrangement must comport with the federal Establishment Clause. In addition, article I, section 7 would prohibit the College District from using public funds to construct sectarian facilities and requires the College District to obtain reasonable consideration for the lease.

## S U M M A R Y

The Weatherford College District board of trustees has implied authority under the Education Code to lease district real property to a private entity, such as the Wesley Foundation, but lacks authority to enter into a lease that interferes with the property's use for district purposes or that divests the board of its exclusive right to manage and control the property.

Section 272.001 of the Local Government Code, which governs the junior college district's authority to sell or exchange land or interests in land and generally requires a district to provide notice of the sale and to obtain bids, may apply to a long-term lease in certain circumstances. In addition, article III, section 52(a) of the Texas Constitution would prohibit the lease if the College District received no or nominal return consideration. Assuming that is not the case, section 52(a) requires the College District's board of trustees to determine in good faith that the proposed lease serves a public purpose of the College District. In addition, the board of trustees must ensure that the lease includes sufficient controls to ensure that the public purpose is carried out.

The United States Constitution's Establishment Clause does not prohibit the College District from leasing land to the Wesley Foundation because of the Foundation's religious affiliation. Whether the lease comports with the Establishment Clause depends upon the totality of the facts, particularly the extent to which the proposed facilities would be associated with the Wesley Foundation or the United Methodist Church and the College District's past practice and general policies with respect to leasing land to private groups. Article I, sections 6 and 7 of the Texas Constitution do not prohibit the lease agreement on the basis of the nonprofit entity's religious affiliation. To comport with these provisions, the proposed lease arrangement must comport with the federal Establishment Clause. Article I, section 7 would prohibit the College District from using public funds to construct sectarian facilities and requires the College District to obtain reasonable consideration for the lease.

Very truly yours,

GREG ABBOTT
Attorney General of Texas

BARRY R. MCBEE
First Assistant Attorney General

DON R. WILLETT
Deputy Attorney General for Legal Counsel

NANCY S. FULLER
Chair, Opinion Committee

Mary R. Crouter
Assistant Attorney General, Opinion Committee