**Jane HAWLEY; Eileen Roberts; and David Finley, Plaintiffs–Appellants,**

v.

**CITY OF CLEVELAND; Director of Port Control; Catholic Diocese of Cleveland; and Bishop Anthony M. Pilla, Defendants–Appellees.**

No. 91–3740.

United States Court of Appeals, Sixth Circuit.

Argued March 21, 1994.

Decided May 18, 1994.

Lester S. Potash, DJR & Associates and Kevin F. O'Neill (argued and briefed), American Civ. Liberties Union of Ohio Foundation, Cleveland, OH, for plaintiffs-appellants.

Heather Graham Oliver (briefed), Edward J. Maher, Ross & Kraushaar, Douglas J. Paul (argued and briefed), Chattman, Garfield, Friedlander & Paul and Bernard H. Niehaus, Cleveland, OH, for defendants-appellees.

Before: KEITH, MARTIN, and DAUGHTREY, Circuit Judges.

BOYCE F. MARTIN, Jr., Circuit Judge.

Pursuant to an ordinance passed by the Cleveland City Council, the Catholic Diocese of Cleveland operates a chapel, in a space the diocese leases from the City of Cleveland, in the terminal building of Cleveland Hopkins International Airport. Claiming that the lease agreement and its authorizing ordinance violate the Establishment Clause of the First Amendment, three Cleveland taxpayers and an advocacy organization brought suit under 42 U.S.C. § 1983 against the city, the city's Director of Port Control, the diocese, and diocese Bishop Anthony M. Pilla. Plaintiffs now appeal the district court's judgment in favor of defendants. For the following reasons, we affirm the judgment of the district court.

## I

Jane Hawley, Lucille Branch, David Finley, and Americans United for Separation of Church and State filed suit challenging the chapel's lease and the lease's authorizing ordinance in federal district court on August 16, 1983.[1] On May 15, 1984, the district court dismissed plaintiffs' action for lack of standing. On October 29, 1985, this Court held that plaintiffs did have standing, reversed the district court, and remanded the case. *Hawley v. City of Cleveland*, 773 F.2d 736 (6th Cir.1985), *cert. denied*, 475 U.S. 1047, 106 S.Ct. 1266, 89 L.Ed.2d 575 (1986). The matter was subsequently tried before the district court on February 5–11, 1991. On July 19, the court rendered judgment for defendants, making the following findings of fact pursuant to Federal Rule of Civil Procedure 52:

1. The plaintiffs are citizens of the United States and resident taxpayers of the City of Cleveland.

2. The defendants include the City of Cleveland, its Director of Port Control, the Catholic Diocese of Cleveland and Bishop Anthony M. Pilla.

3. Cleveland Hopkins International Airport (the "Airport"), is a major, modern airport facility currently served by 16 airlines, providing non-stop service to over 60 major U.S. cities, and connecting service to points all over the world. The Airport occupies an 18,000 acre site. The passenger terminal measures 690,000 square feet. At Hopkins can be found nearly 5,000 parking spaces; 12 passenger elevators, 8 speedwalks and 13 escalators. There are also 5,000 airline and other tenant employees based at Hopkins.

4. To serve the employees, patrons and passengers at this major transportation facility and solely to accommodate persons using the Airport, there are various commercial establishments including newsstands, book stores, flower stores, country stores, candy shops, restaurants, cafeterias, bars, and baking and hotel facilities. In addition, Hopkins has five rental car

companies and eleven freight companies. There are also non-profit service establishments such as the U.S.O. and a Travelers' Aid center, as well as the Chapel, which is the subject of this litigation.

5. Pursuant to Ordinance Nos. 843–82, 2124–82, and 1607–83, duly passed by Cleveland City Council, the Director of Port Control, on behalf of the City of Cleveland, entered into an agreement, effective August 1, 1983, with Anthony M. Pilla, Bishop of the Catholic Diocese of Cleveland[,] for the use of approximately 2,733 square feet of space located in the terminal building of the Airport for the operation of a Chapel. The Airport Chapel was intended by the City to provide services to the traveling public and employees at the airport.

6. City of Cleveland Ordinance No. 843–82, introduced by Councilmen Ciolek and Forbes, by Department Request, "Authorizing the Director of Port Control to enter into an Agreement with Anthony M. Pilla, Bishop of Cleveland, for use of certain space at Cleveland Hopkins International Airport", was read for the first time in the Cleveland City Council on April 19, 1982. The legislation was referred to the Director of Port Control, who approved it on April 21, 1982, the Director of Finance, who noted his approval on April 30, 1983 (sic), and the Law Director of the City of Cleveland, who found "no legal objection to the passage of the within ordinance", on May 2, 1982. The legislation was also referred to the Committee on Aviation, Lakefront Development and Transportation, which recommended passage on May 3, 1982, and the Committee on Finance, which recommended passage on May 13, 1982. The ordinance had a second and third reading on May 17, 1982, and May 24, 1982, respectively. Ordinance 843–82 was signed by the Mayor on May 28, 1982.

7. City of Cleveland Ordinance No. 2142–82, introduced by Councilmen Ciolek and Forbes, by Departmental Request, "To

---

1. After the addition and dismissal of various plaintiffs, the plaintiffs currently are Hawley, Finley, and Eileen Roberts.

amend Section 1 of Ordinance No 843–82, passed May 24, 1982, relating to the use of certain space at Cleveland Hopkins International Airport", was read for the first time in the Cleveland City Council on September 27, 1982. The legislation was referred to the Director of Port Control, who approved it on September 29, 1982, the Director of Finance, who noted his approval, and the Law Director of the City of Cleveland, who found "no legal objection to the passage of the within ordinance", on October 4, 1982. The legislation was also referred to the Committee on Aviation, Lakefront Development and Transportation, which recommended passage on October 25, 1982. The ordinance had a second and third reading on December 6, 1982. Ordinance 2124–82 was signed by the Mayor on December 8, 1982.

8. City of Cleveland Ordinance No. 1607–83, introduced by Councilmen Ciolek, Johnson, Woods and Forbes, by Departmental Request, "To amend Section 1 of Ordinance No. 843–82, passed May 24, 1982, as amended by Ordinance No. 2142–82, passed December 6, 1982, authorizing the Director of Port Control to enter into an Agreement with Anthony M. Pilla, Bishop of Cleveland, for use of certain space at Cleveland Hopkins International Airport", was read for the first time in the Cleveland City Council on May 23, 1983. The legislation was referred to the Director of Port Control, who approved it on May 24, 1983, the Director of Finance, who noted his approval on May 27, 1983, [and] the Law Director of the City of Cleveland, who found "no legal object[ion] to the passage of the within ordinance", on June 20, 1983. It was approved by the City Planning Commission on June 17, 1983. The legislation was also referred to the Committees on Aviation, Lakefront Development and Transportation, the Committee on Real Property, the Committee on City Planning, and the Committee on Finance, all of which recommended passage on June 20, 1983. The ordinance had a second and third reading on June 20, 1983. Ordinance 1607–83 was signed by the Mayor on June 23, 1983.

9. The legislation authorizing the lease between the City of Cleveland and the Diocese of Cleveland for the Airport Chapel took over 14 months to be approved by the Cleveland City Council.

10. Cleveland Hopkins International Airport is an entirely self[-]sustaining unit in the economic sense and receives not a cent from the tax-supported general fund of the City of Cleveland. Airport operations, development and expansion is paid exclusively by bond proceeds, airline rentals, airport user fees, landing fees, concession fees and other operating revenue. The bonds which finance airport activities are secured by the airlines. If, at year's end, airport expenses exceed revenue, this loss is adjusted by charging the airlines under the formula set forth in the Agreement and Lease between the airlines and the City. Likewise, year end revenue is credited to the airlines. The Airport is, therefore, not supported by or dependent upon any municipal or state tax dollars.

11. As an incentive to the City to provide good management for the Airport System, an incentive compensation payment is provided which is paid from Airport Revenues to the General Fund of the City. Such amounts, if any, are determined for each year by a formula located in Section 8.06(b) of the Agreement and Lease between the Airlines and the City. There were no incentive compensation payments made in the years 1984, 1986 and 1988, but such payments were made in 1985 and 1987. Even if the Chapel's rent were $60,-000 per year, this amount would have no impact whatsoever on the incentive payment calculations. It would neither produce an incentive payment when there otherwise was none, nor would it increase what otherwise was paid in 1985 and 1987. In fact, calculations performed by the City[,] and accepted into evidence, demonstrate that the incentive payments for those years would have actually been reduced had the Diocese been paying more rent for the Airport Chapel space.

12. The Administration of the Airport makes its decision as to the appropriateness of particular uses of space at the Airport based upon passenger usage, the

public nature of the service provided, the needs of the airlines and their employees and the prevailing practice at other airports in the nation. The Airport has conducted studies about the need for particular uses at the Airport.

13. There are airport chapels existing in at least 16 other airports in the Continental United States. There had long been a small space designated as a Chapel in the plans of the Airport. However, that space did not effectively function as a chapel prior to the building of the existing Chapel by the Diocese and the appointment of Monsignor Blair as Chaplain.

14. Rental fees at Hopkins are based upon the nature of the entity seeking space and the desirability of the space itself. Commercial entities are typically charged a base rental rate plus a percentage of the gross receipts of the operation of such entity at the airport. Non-profit entities, including Travelers Aid and [the] U.S.O. are charged $1.00 per year for the space they occupy, and some political and religious groups are given temporary space, free of charge, to solicit for their causes.

15. There is no obligation upon the Airport to charge a market rate for any of the space at the Airport and it is common for airports to charge non-profit tenants less than full market rent.

16. Pursuant to the Agreement between the Bishop and the City, the Chapel is located at the base of Concourse B in the Airport's passenger terminal building. The Chapel site is not prime, or even desirable commercial airport space. The area is in the passageway leading to the least traveled concourse at the Airport, accounting for only 20% of the total passengers using the Airport.

17. The space leased to the Diocese in 1983 was at the time the Lease was entered into, in a state of disrepair and in need of permanent improvements to render it functional. It had never before been rented. Not a single commercial enterprise had ever expressed any interest in leasing this space for commercial purposes. Indeed, the only use of this space was as an emergency medical center for internal airport purposes. The premises leased by the Diocese had been used for storage by custodial workers and lockers since 1979 and remained unused entirely during the 1970's.

18. The bank location next door to the location of the Chapel at the Airport has been vacated and has not yet been re-rented. Since prior to the execution of the lease for the Chapel, there has continuously been vacant space at the Airport. Some of the space at the Airport which was vacant at the time that the Chapel lease was entered into is still vacant.

19. The Catholic Diocese of Cleveland constructed an addition to the Airport, at the sole cost and expense of the Catholic Diocese of Cleveland, wherein Twenty–Seven Hundred Thirty–Three (2,733) square feet of space at the base of Concourse B in the airport passenger terminal building is used by the Diocese of Cleveland as and for a Chapel providing aid and comfort, as well as rendering service to the air traveling public, and to airport patrons and employees of the Airport and tenants at the Airport. The construction of the Airport Chapel was done in complete conformity with the architectural design of the Airport, and is not visually seen to be a Chapel from either the outside of the Airport nor by walking down Concourse B.

20. In the construction of the Chapel facility at Cleveland Hopkins International Airport, the Diocese of Cleveland, through voluntary contributions, spent Two Hundred Eighty–Seven Thousand Three Hundred Nine Dollars ($287,309.00), including monies to actually expand the rentable space at the Airport, plus Seventeen Thousand Eight Hundred Ninety–Nine Dollars ($17,899.00) in architectural and engineering service fees, and Thirty–Three Thousand One Hundred Twenty–Eight Dollars ($33,128.00) in interior furnishings, for a total expenditure of Three Hundred Thirty–Eight Thousand Three Hundred Thirty–Six Dollars ($338,336.00). The Airport Chapel at Cleveland Hopkins International Airport opened in February, 1986.

21. The exterior of the Airport Chapel, outside of a sign indicating that it is a

Chapel, displays no religious symbols or other indications of religious purpose to those passing nearby on the Concourse.

22. Although the interior of the Airport Chapel contains statuary and other symbols of the Catholic faith, the only thing which is not easily removable is the tabernacle and that can be, and has been, screened off from view to accommodate other religious organizations and individuals desiring to use the Airport Chapel.

23. Prayer cards of several religious faiths, including Baha'i, Jewish (in Hebrew and English), Protestant, and Catholic, are available to the public at the Airport Chapel and are provided at the sole cost and expense of the Diocese.

24. The Airport Chapel is a non-profit service enterprise, whose purposes are exclusively for aid, comfort and service to the air traveling public, as well as airport patrons and employees, in furtherance of the public purpose of the Airport. City Council determined that the Diocese should be treated similar to the other non-profit organizations with space at the Airport. The Diocese of Cleveland pays One Hundred Dollars ($100.00) per month, or Twelve Hundred Dollars ($1,200.00) per year, rental, in addition to the payment of all utilities. However, if the cost of the construction of the Chapel is included, the effective rental rate being paid by the Diocese for the premises is $14.91 per square foot. Article IV. of the Lease Agreement between the City of Cleveland and the Diocese of Cleveland requires that the Airport Chapel be made available to other religious groups and individuals "regardless of the religious content of their worship activities."

25. The City of Cleveland regularly allows religious groups to use space at the Airport, to confront people directly, and to distribute literature if such other religious groups wish to do so. This may be done in public areas with direct access to the public, as opposed to being within a confined area. The Airport Chapel is available for use by persons of all religious persuasions, for meditation, reflection, prayer, and quiet time throughout the day and early evening, and for more formal worship services.

26. The Diocese of Cleveland, through Monsignor Robert C. Blair, Chaplain of the Airport Chapel, has taken numerous steps to publicize the availability of the Airport Chapel for use by persons of all faiths and denominations, including letters directed to 22 leader[s] of major denominations in the Cleveland area, sent within the first month after the opening of the Chapel.

27. The Airport Chapel has been used by several other religious groups and organizations of widely different faiths, both Christian and non-Christian. No one has ever been denied the opportunity to use the Airport Chapel.

28. The Airport Chapel is open to the public each day until 8:30 P.M. Monsignor Robert C. Blair is available at the Airport on a full-time basis, and is on-call virtually around-the-clock to assist and serve the needs of the Airport's patrons and employees, and also the air traveling public. He is part of, and has participated in drills in connection with, the Airport's emergency disaster relief network. On innumerable occasions, Monsignor Robert C. Blair, Chaplain at the Airport Chapel, has rendered, and continues to render, invaluable secular service to Cleveland Hopkins International Airport, its officers and representatives, the employees located at the airport and the air traveling public.

29. Over the years, many thousands of people have visited the Airport Chapel and made, in many instances, favorable comments concerning its availability, and assistance to them. The Visitor's Books show that the Airport Chapel has been visited by air travelers from most of the countries in Europe, South America and Asia, as well as people of the United States of America. Over Fifteen Thousand (15,000) people have signed the Visitor's Books.

30. Travellers and airport and airline employees, both Catholic and non-Catholic, regularly use the Chapel as a source of solitude where they can collect their thought[s], meditate, or work through problems which are troubling them. Em-

ployees of the airlines and other tenants of the Airport have used the Chapel to fulfill their own personal religious obligations when the circumstances of their employment would have made it difficult to do so otherwise.

31. On the weekend immediately preceding trial of this matter, approximately 128 people fulfilled their Sunday Mass obligation by attending the regularly scheduled services at the Airport Chapel.

32. Several airline representatives have written letters thankful for, and in support of, the services and facilities provided at the Airport Chapel.

Joint Appendix at 27–37 (footnote omitted).

The district court also made several notable conclusions of law. First, the court found that both under the test announced by the Supreme Court in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), and under the refined version of that test announced in *County of Allegheny v. ACLU, Greater Pittsburgh Chapter,* 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989), the chapel's lease and its authorizing ordinance do not violate the Establishment Clause of the First Amendment. Second, in reaching this conclusion, the court observed that leases for the use of non-public fora (such as airports) need only meet a reasonable basis test. *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.,* 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). Finally, the district court acknowledged that two other circuits have upheld the constitutionality of religious facilities within municipal airports: *Christian Science Reading Room Jointly Maintained v. City and County of San Francisco,* 784 F.2d 1010 (9th Cir.1986), *amended,* 792 F.2d 124 (9th Cir. 1986), *and cert. denied,* 479 U.S. 1066, 107 S.Ct. 953, 93 L.Ed.2d 1002 (1987); *Brashich v. Port Authority of New York and New Jersey,* 484 F.Supp. 697 (S.D.N.Y.1979), *aff'd without op.,* 628 F.2d 1344 (2d Cir.1980), *supplemental op.,* 791 F.2d 224 (2d Cir.1980).

On August 14, 1991, plaintiffs filed a timely notice of appeal.

## II

On appeal, plaintiffs argue that: (1) the Catholic chapel at Cleveland's airport violates the Establishment Clause because its effect impermissibly advances the Catholic religion; (2) the lease agreement between the diocese and the city violates the Establishment Clause because its purpose of providing religious services on public property predominates any secular purpose; (3) the lease reflects a joint partnership between church and state that is forbidden by the Establishment Clause; and (4) the failure of the city to charge the diocese a fair market rent constitutes impermissible aid to religion in violation of the Establishment Clause. We disagree.

## III

■ Before turning to the substantive analysis of whether the chapel violates the Establishment Clause, we must first address the procedural ramifications of the death of the trial's court reporter, and plaintiffs' subsequent failure to avail themselves of Federal Rule of Appellate Procedure 10(c). Because of the inability of other court reporters to decipher the trial reporter's notes, no transcript of the proceedings in this case is available. Moreover, plaintiffs have chosen not to supplement the record on appeal pursuant to Rule 10(c), but rather to rely solely on the small portion of the transcript that the reporter was able to complete (less than one day's worth of a six-day trial), coupled with trial exhibits and depositions that were filed with the district court in advance of trial. Plaintiffs claim that they have chosen not to comply with Rule 10(c) because "the inevitable disputes with opposing counsel over what was said at trial would only prolong this appeal even further." Plaintiffs' Brief at 2. In response, defendants argue that plaintiffs' failure to provide a record of the evidence adduced at trial essentially precludes this Court from granting the relief sought by plaintiffs.

■ Two sections of Rule 10 are applicable to this dispute. First, Rule 10(b)(2) provides, in pertinent part:

If the appellant intends to urge on appeal that a finding or conclusion is unsupported by the evidence or is contrary to the evidence, the appellant shall include in the record a transcript of all evidence relevant to such finding or conclusion.

Second, Rule 10(c) provides:

If no report of the evidence or proceedings at a hearing or trial was made, or if a transcript is unavailable, the appellant may prepare a statement of the evidence or proceedings from the best available means, including the appellant's recollection. The statement shall be served on the appellee, who may serve objections or proposed amendments thereto within 10 days after service. Thereupon the statement and any objections of proposed amendments shall be submitted to the district court for settlement and approval and as settled and approved shall be included by the clerk of the district court in the record on appeal.

Although the preliminary language of Rule 10(c) is not mandatory ("appellant *may* prepare a statement"), Rule 10(c) supplies the only possible means of meeting the Rule 10(b)(2) requirement in cases where transcripts of the proceedings are unavailable. Read as a whole, therefore, Rule 10 provides that an appellant need not invoke Rule 10(c) in every case where a transcript is unavailable, but must do so if the transcript is unavailable and the appellant "intends to urge on appeal that a finding or conclusion is unsupported by the evidence or is contrary to the evidence." FED.R.APP.P. 10(b)(2).

■ Although not explicitly adopting the above reading of Rule 10 in a case such as the instant matter, this Court has drawn the same conclusion in similar contexts. In *Herndon v. City of Massillon,* 638 F.2d 963 (6th Cir.1981), for example, the appellant challenged jury instructions that had not been transcribed by the court reporter. Without availing himself of Rule 10(c), the appellant argued that the absence of a record so insulated any error in the instructions from review that he should be entitled to a new trial. *Id.* at 965. In rejecting this

contention, this Court cited with approval its earlier holding that plaintiffs' failure to avail themselves of "the procedure designed to reconstruct unrecorded proceedings [leaves] them with no objection based on the missing record." *Id.* (citing *Illinois Central Railroad Co. v. Riley,* 392 F.2d 787 (6th Cir. 1968), which involved Federal Rule of Civil Procedure 75(c), the predecessor to Federal Rule of Appellate Procedure 10(c)).[2] This Court has also held that the sufficiency of the evidence to support a verdict cannot be challenged on appeal in the absence of either a transcript or a statement of the evidence in narrative form. *King v. Carmichael,* 268 F.2d 305, 306 (6th Cir.1959), *cert. denied,* 361 U.S. 968, 80 S.Ct. 597, 4 L.Ed.2d 548 (1960).

Other circuits have reached a similar conclusion in cases in which appellants have failed to invoke Rule 10(c). *See Herndon,* 638 F.2d at 965 (collecting cases). In *United States v. Mills,* 597 F.2d 693, 698 (9th Cir. 1979), for example, a defendant sought to submit an affidavit of counsel, which purportedly described an unreported pretrial conference in chambers, in support of his claim on appeal that the district court improperly enhanced his sentence as a result of his decision to stand trial. The Ninth Circuit refused to consider the affidavit on the ground that the defendant had not followed the provisions of Rule 10(c) for augmenting "the record on appeal concerning proceedings which were not reported." *Id.* As the Fifth Circuit has succinctly observed, "[w]here an appellant fails to provide an adequate appellate record on an issue finally decided by a prior court, that failure makes his road to victory difficult at best." *In re Evangeline Refining Co.,* 890 F.2d 1312, 1322 (5th Cir. 1989).

In light of the foregoing, plaintiffs cannot justify their failure to invoke Rule 10(c) merely by asserting that to do so would have led to disputes with opposing counsel and a further delay of the appeal. Plaintiffs' presentation of a significant number of exhibits and depositions is no substitute for a statement of the proceedings that, pursuant to Rule 10(c), has been scrutinized and critiqued by defendants, and, perhaps most important-

---

2. In affirming a conviction despite the trial court's failure to record side-bar conferences, this Court noted in a more recent case that the appellant could have, but failed to, avail himself of Rule 10(c). *See United States v. Ellzey,* 874 F.2d 324, 331 (6th Cir.1989).

ly, approved by the district court. Because the record on appeal in this case does not allow for an objective evaluation of the actual evidence presented at trial, we adopt the district court's findings of fact in their entirety.

## IV

We turn, then, to plaintiffs' constitutional challenge to the airport chapel. In 1971, the Supreme Court articulated the following three-part approach to determining whether a statute or government practice violates the Establishment Clause: (1) the statute or practice must have a secular purpose; (2) its principal or primary effect must be one that neither advances nor inhibits religion; and (3) the statute or practice must not foster an excessive government entanglement with religion. *Lemon*, 403 U.S. at 612–13, 91 S.Ct. at 2111. Potentially shifting the focus of this test, the Court announced in 1989:

> Our subsequent decisions further have refined the definition of governmental action that unconstitutionally advances religion. In recent years, we have paid particularly close attention to whether the challenged governmental practice either has the purpose or effect of "endorsing" religion, a concern that has long had a place in our Establishment Clause jurisprudence.

*Allegheny*, 492 U.S. at 592, 109 S.Ct. at 3100. More recently, however, the Supreme Court explicitly declined an invitation by an amicus curiae to reconsider the *Lemon* test. *Lee v. Weisman*, —— U.S. ——, ——, 112 S.Ct. 2649, 2654–55, 120 L.Ed.2d 467, 480 (1992).

In *Americans United for Separation of Church and State v. City of Grand Rapids*, 980 F.2d 1538 (6th Cir.1992) (en banc), this Court made clear its understanding of the proper approach to Establishment Clause cases. We apply the three-part *Lemon* test, and use the standard announced in *Allegheny* (*i.e.* whether the challenged governmental practice or statute endorses religion) as a means of explicating the test's second prong (*i.e.* whether the principal or primary effect of a statute or practice is one that neither advances nor inhibits religion). *Id.* at 1543. Moreover, in ascertaining whether a governmental practice endorses religion, this Court considers whether a reasonable observer would conclude that the government endorses religion by allowing the practice in question. *Id.* at 1544.

Given these legal standards and the district court's findings of fact, we conclude that the chapel serves the secular purpose of accommodating the religious needs of travellers and providing them with a place for rest and comfort. Moreover, because a reasonable observer would not conclude that the city endorses religion by allowing the diocese to maintain the chapel, the chapel's lease and its authorizing ordinance do not constitute an endorsement of religion, and thus their primary effect is one that neither advances nor inhibits religion. We find, finally, that the chapel's lease and its authorizing ordinance also do not foster an excessive government entanglement with religion. Accordingly, the lease and the ordinance do not violate the Establishment Clause of the First Amendment.[3]

## V

For the foregoing reasons, the judgment of the district court is affirmed.

---

**3.** We are aware that the current standard for establishing whether a statute or government practice violates the Establishment Clause is a matter of some debate. Notwithstanding the Supreme Court's 1992 decision in *Lee* declining to reconsider the *Lemon* test, Justice Scalia, joined by Justice Thomas, wrote separately in an Establishment Clause case decided by the Court just last year solely to make clear that he disagreed with the majority's use of the *Lemon* test. *See Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, —— U.S. ——, ——–——, 113 S.Ct. 2141, 2149–50, 124 L.Ed.2d 352, 365–66 (1993)

(Scalia, J., concurring) (criticizing and declining to apply the *Lemon* test). Moreover, a majority of the Court decided a subsequent Establishment Clause case without any reference to the *Lemon* test, except to acknowledge that it was applied by the court of appeals. *Zobrest v. Catalina Foothills Sch. Dist.*, —— U.S. ——, 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993). For the purposes of the instant dispute, we note that *Zobrest* does not change our conclusion that the airport chapel's lease and the ordinance do not violate the Establishment Clause.