**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 09a0614n.06

Nos. 08-1710/1779/1820

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
**Aug 27, 2009**
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| LAMONT BERNARD HEARD, | ) | |
| | ) | |
| **Plaintiff-Appellant,** | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PATRICIA CARUSO, named as | ) | **ON APPEAL** FROM THE |
| Director of the Michigan Department | ) | UNITED STATES DISTRICT |
| of Corrections, in her individual | ) | COURT FOR THE WESTERN |
| capacity, et al., | ) | DISTRICT OF MICHIGAN |
| | ) | |
| **Defendants-Appellees,** | ) | |
| | ) | **O P I N I O N** |
| RANDALL MASKER, named as Mail | ) | |
| Room Supervisor, in his individual | ) | |
| capacity. | ) | |
| | ) | |
| **Defendant-Appellee.** | ) | |
| | ) | |

Before: MOORE, CLAY, and KETHLEDGE, Circuit Judges.

KAREN NELSON MOORE, Circuit Judge. Lamont Bernard Heard ("Heard"), a

Michigan prisoner proceeding pro se, appeals the district court's grant of summary judgment in favor

of Defendants-Appellees, several employees of the Michigan Department of Corrections ("MDOC"),

in this civil-rights action filed under 42 U.S.C. § 1983.[1] Additionally, Heard appeals the judgment

---

[1]These defendants include: Patricia L. Caruso, Director of the MDOC; Unknown Straub, Deputy Director of the MDOC; Dave J. Burnett, MDOC Special Activities Coordinator; Robert Mulvaney, MDOC Security Threat Group Coordinator; Jeri-Ann Sherry, Warden of Chippewa Correctional Facility ("Chippewa"); Greg McQuiggin, Deputy Warden of Chippewa; Michael Brown, Security Threat Group Coordinator at Chippewa; Steven Therrian, a lieutenant at Chippewa;

in favor of MDOC employee Randall Masker ("Masker") following a bench trial on Heard's claim that Masker opened Heard's legal mail outside Heard's presence. These cases have been referred to a panel of the court pursuant to Rule 34(j)(1), Rules of the Sixth Circuit. Upon examination, this panel unanimously agrees that oral argument is not needed. Because there remains a genuine issue of material fact as to whether Heard's placement in a maximum-security prison implicates a protected liberty interest, we **VACATE** that part of the district court's summary-judgment order and **REMAND** for further consideration of whether Heard's confinement implicates a liberty interest and, if so, whether the state has given Heard the process to which he is due. We also **VACATE** that part of the summary-judgment order dismissing Heard's equal-protection and RLUIPA claims for prison officials' failure to accommodate his request for a Nation-of-Islam diet, and **REMAND** for further proceedings. We **AFFIRM** the remaining parts of the district court's summary-judgment order, **AFFIRM** the judgment in favor of Masker, and **AFFIRM** the various other rulings by the district court that Heard challenges on appeal.

## I.  BACKGROUND

Heard is an inmate in the custody of the MDOC who has been confined to various maximum-security facilities since October 21, 2004.[2]  Previously, Heard was confined at Chippewa Correctional Facility ("Chippewa"), a low- to medium-security facility in Kincheloe, Michigan. On September 18, 2004, prison officials placed Heard in segregation and charged him with major-

_____

Sandy Shaw, a chaplain at Chippewa; Daniel Ezrow, an inspector at Baraga Maximum Correctional Facility ("Baraga"); and D. Huhta, a resident unit officer at Baraga.

[2]The record indicates that Heard has been confined to at least three different maximum-security facilities, including the Standish Maximum Correctional Facility in Standish, Michigan, the Baraga Maximum Correctional Facility in Baraga, Michigan, and the Marquette Branch Prison in Marquette, Michigan.

misconduct ("Incite to Riot or Strike:  Rioting or Striking") because of statements Heard made during a Nation-of-Islam religious service.  R. 78 Ex. E-B (Major Misconduct Report 9/18/04 at 2). During a speech generally discussing the Nation of Islam and the history of oppression of black people in the United States, Heard stated, among other things, that "a resurrected man will not put up with mistreatment and will strike back," "mention[ed] the . . . Fruits of Islam—[the] [s]ecurity Force of [the Nation of Islam]," "state[d] that . . . the only way to establish peace was through war," and "stated that the officers do not want peace as that disharmony is the 'crux of their existence' and maintains their jobs and livelihood."  R. 78 Ex. E-A (Therrian Memo 9/18/04).  Heard also stated that "we have a real problem here." *Id.*  When later asked by a prison official what he meant by this, "Heard responded [that] he meant at [Chippewa] . . . the officers . . . do not respect the black man, but they will." *Id.*

Heard requested a hearing and access to relevant documents and witnesses.  At the hearing, Heard did not deny making these statements, but argued that prison officials had taken his words out of context from a speech that generally concerned the history of black people in the United States, with references to the film *The Passion of the Christ* and various Bible verses.  R. 78 Ex. E-B (Misconduct Hearing Report 9/23/04 at 1).  Heard contended that his speech was not threatening, did not show disrespect toward correctional officers or disrupt the prison, and was protected by the First Amendment.  At the conclusion of the hearing, the hearing officer upheld Heard's major-misconduct charge and placement in segregation, finding that Heard's speech was "in a prison setting" and was "not protected speech because he is advocating more than mere speech but conduct by instigating actions which are intended to seriously endanger the physical safety of the facility, persons or property." *Id.*

3

On October 7, 2004, Heard's major-misconduct citation led prison officials to identify Heard as a "recruiter," classify him as an adherent of "Intolerant/Subversive Groups," and, following an interview with Heard, designate him a Security Threat Group ("STG") II under the MDOC's security-threat classification system. R. 78 Ex. I (Brown Aff. ¶¶ 6-8). Under MDOC policy, Heard's STG II designation automatically resulted in his transfer to a Level V maximum-security facility.

Heard filed internal grievances challenging both his initial major-misconduct citation and his STG II designation; all were denied by prison officials. Heard also filed a request for removal of his STG II designation, arguing that his designation as a "recruiter" under the "Intolerant/Subversive Groups" category targeted his membership in the Nation of Islam. On October 21, 2004, defendant Brown, Chippewa's STG Coordinator, denied Heard's request for removal of the STG II designation, explaining that Heard's designation as a "recruiter" and adherent of "Intolerant/Subversive Groups" was not based upon Heard's membership in the Nation of Islam but instead was based upon his actions and statements, which "were a call to arms, a call to others to rise up with you and join your cause." R. 78 Ex. I-A (Brown Memo 10/21/04 at 2). Since being designated STG II in October 2004, Heard has been confined at maximum-security facilities in the Michigan prison system. Heard's confinement in maximum-security facilities evidently continues indefinitely until prison officials decide to remove his STG II designation. Under MDOC policy, prison officials must review a prisoner's STG designation at least once every six months.

On September 23, 2005, Heard, proceeding pro se, filed this § 1983 action, challenging on several constitutional grounds the disciplinary actions taken against him and his placement and continued confinement in maximum-security facilities. Heard alleged that his procedural-due-process rights were violated when he was designated a security threat (i.e., STG II) and placed in

4

maximum-security facilities without the procedural protections to which he was due. Heard also alleged that prison officials initiated these disciplinary actions against him in retaliation for his exercise of his First Amendment rights in his September 18, 2004 speech. Heard asserted that prison officials further retaliated against him for filing grievances challenging these disciplinary actions. Heard's complaint also challenged the refusal of prison officials to accommodate his request for a dietary regimen recommended by the Nation of Islam, asserting both an equal-protection claim and a claim under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1 *et seq.* Heard additionally asserted a retaliation claim against defendant Huhta, a corrections officer at Baraga Maximum Correctional Facility ("Baraga"), alleging that Huhta planted a bullet shell in Heard's cell in retaliation for Heard's threat to file a lawsuit against prison officials. Finally, Heard alleged that defendant Masker opened and read Heard's legal mail outside of Heard's presence, despite Heard's request to have his legal mail opened only when he is present.

On September 28, 2005, the district court granted Heard leave to proceed in forma pauperis. On December 21, 2005, the Defendants filed a motion to stay discovery on the ground that they soon would be filing motion to dismiss Heard's complaint for failure to state a claim upon which relief can be granted. The district court granted a stay of discovery on December 23, 2005. After obtaining two extensions of time to file a responsive pleading, the defendants filed a motion to dismiss on February 13, 2006, arguing that Heard's complaint mis-joined parties in violation of Federal Rules of Civil Procedure 20 and 21 by asserting claims against various defendants that did not arise out of the same transaction or occurrence or present common questions of law and fact. On April 3, 2006, a magistrate judge issued a report and recommendation ("R&R") recommending

5

denial of the defendants' motion to dismiss.[3] The district court approved the R&R on August 22, 2006.

On June 5, 2006—while defendants' motion to dismiss was pending before the district court—the defendants filed a motion for summary judgment seeking dismissal of all of Heard's claims. On July 5, 2006, Heard served defendants with a number of discovery requests, including interrogatories and requests for admissions. On July 21, 2006, the defendants filed a second motion to stay discovery, arguing that the burden and expense of responding to Heard's discovery requests would outweigh the likely benefits and requesting that discovery not be permitted pending the disposition of the defendants' motion for summary judgment. Heard filed an opposition to the defendants' motion to stay discovery, arguing that the defendants possessed information essential to establishing fact issues for his various claims and that it would be improper for the district court to rule on the defendants' summary-judgment motion without first giving him an opportunity to conduct discovery.

On August 8, 2006, the magistrate judge issued an order granting the defendants' motion to stay discovery. The order stated that if Heard believed he needed discovery to defend against defendants' summary-judgment motion, he could "file a supplemental response, indicating as specifically as possible what facts he believes might be revealed in discovery which will support his cause." R. 109 (Order Granting Mot. to Stay Discovery 8/8/06). On August 15, 2006, Heard filed a supplemental response, which included an affidavit sworn by Heard identifying various documents and information that Heard believed were possessed by defendants and stating how Heard believed

---

[3]The R&R also recommended denial of Heard's motion for a preliminary injunction and motion for summary judgment, both of which had been filed before the defendants filed their motion to dismiss.

this material could defeat defendants' summary-judgment motion. *See* R.113 (Heard Supplement 8/15/06). The district court did not rule on or otherwise respond to Heard's supplemental response.

On November 21, 2006, the magistrate judge issued an R&R recommending that summary judgment be granted in favor of defendants on all of Heard's claims. On February 6, 2007, after reviewing Heard's objections, the district court issued an opinion and order modifying the R&R and dismissing the case except as to Heard's claim against defendant Masker for opening Heard's legal mail outside of Heard's presence. The district court subsequently denied Heard's motion to alter or amend the summary-judgment order and Heard's motion for relief from that order. The district court also denied Heard's February 28, 2008 motion to appeal an order of the magistrate judge that allowed Heard to take the deposition of defendant Masker but disallowed Heard the use of a camera recorder or tape recorder to make a record of the deposition. Heard filed a notice of appeal from that order on May 23, 2008 (appeal No. 08-1710).

On May 20, 2008, the district court held a bench trial on Heard's remaining claim against defendant Masker and on May 28, 2008, entered judgment for Masker. On June 11, 2008, Heard filed a notice of appeal from the judgment for Masker and the district court's prior order denying relief from the summary-judgment order (appeal No. 08-1779). Heard also filed a supplemental notice of appeal on June 18, 2008 (appeal No. 08-1820). The district court denied Heard's motion for a new trial on November 18, 2008.

On appeal, Heard challenges the district court's grant of summary judgment for all defendants except Masker, the district court's denial of his discovery requests, the judgment following a bench trial in favor of Masker, and several other rulings by the district court.

7

## II.  ANALYSIS

### A.  Summary-Judgment Order

#### 1.  Standard of Review

We review a district court's grant of summary judgment de novo. *Miller v. Admin. Office of the Courts*, 448 F.3d 887, 893 (6th Cir. 2006).  The moving party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

#### 2.  Procedural-Due-Process Claim

Heard argues that the district court erred in dismissing his procedural-due-process claim because he has a cognizable "liberty" interest in avoiding STG II designation and the attendant confinement to maximum-security facilities.  In order to prevail on a procedural-due-process claim, an inmate must first demonstrate that he was deprived of "life, liberty, or property" by government action. *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005).  Prisoners retain a liberty interest with respect to state-imposed prison discipline that "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995).  If a prisoner establishes a liberty interest, the next question is what process the state must afford before imposing the discipline in question. *Austin*, 545 U.S. at 224.

The initial question in this case is whether Heard's allegedly indefinite confinement to maximum-security facilities because of his STG II designation constitutes an "atypical and significant hardship on [him] in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484.  In *Sandin*, the Supreme Court held that an inmate's assignment to disciplinary segregation for

8

thirty days did not impose an "atypical, significant deprivation" that implicated an inmate's liberty interest. *Id.* at 486. In reaching this conclusion, the Court explained that disciplinary segregation at the prison generally "mirrored those conditions imposed upon inmates in administrative segregation and protective custody," the inmate's confinement in segregation "did not exceed similar, but totally discretionary, confinement in either duration or degree of restriction," and the inmate's segregation would not "inevitably affect the duration of his sentence." *Id.* at 486-87. In *Austin*, however, the Supreme Court held that placement in Ohio's maximum-security prison did implicate an inmate's liberty interest. The Court concluded that assignment to the maximum-security prison "impose[d] an atypical and significant hardship under any plausible baseline," and listed several factors that distinguished such confinement from the disciplinary segregation at issue in *Sandin* :

> For an inmate placed in [the maximum-security prison], almost all human contact is prohibited, even to the point that conversation is not permitted from cell to cell; the light, though it may be dimmed, is on for 24 hours; exercise is for 1 hour per day, but only in a small indoor room. Save perhaps for the especially severe limitations on all human contact, these conditions likely would apply to most solitary confinement facilities, but here there are two added components. First is the duration. Unlike the 30-day placement in *Sandin*, placement at [the maximum-security prison] is indefinite and, after an initial 30-day review, is reviewed just annually. Second is that placement disqualifies an otherwise eligible inmate for parole consideration. While any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context. It follows that respondents have a liberty interest in avoiding assignment to [the maximum-security prison].

*Austin*, 545 U.S. at 223-24 (citations omitted).

The district court—without explanation—found that Heard's placement in maximum-security facilities in Michigan was not an "atypical and significant hardship" that implicated a liberty interest. However, the limited record before us suggests that there is a fact question as to whether

9

confinement to Michigan's maximum-security facilities—like the Ohio maximum-security prison at issue in *Austin*—implicates a protected liberty interest. On August 30, 2006, Heard filed a motion to supplement,[4] adding the following paragraph to a sworn declaration that he had previously filed on January 10, 2006:

> Security Threat Group designations to status II result in plaintiff being placed in a maximum security prison, which is the most secured of all Michigan Department of Corrections prisons; but plaintiff does not challenge the increase in classification as a result of the STG designation. The challenge is to the atypical and significant hardships place[d] on plaintiff as a result of the designation that trigger due process. The designations are indefinite and paroles are automatically denied, there are only five minute showers (which include washing and drying off); visits are restricted to two one hour non-contacts visits per month; and all human contact is limited to yard, dining hall, library and religious service which culminate to a potential maximum of 21 hours out [of] the cell per week. Cell to cell communication is prohibited, the lights, though [they] may be dimmed at night, [are] on 24 hours a day. These conditions are not ordinary conditions in the life of a prisoner in lower levels (1-4) in MDOC.

R. 117 (Mot. to Supplement 8/30/2006). Heard also submitted a "Parole Board Notice of Decision," indicating that Heard was denied parole on June 19, 2006, in part because of his designation as STG II and his placement in a maximum-security facility. R. 100 (Mot. for Leave to File Exhibit 7/14/06 at 2). It is not clear from this document whether, as in *Austin*, Heard's maximum-security designation automatically disqualifies him for parole. Finally, the record shows that prison officials are required to review a prisoner's STG II status only once every six months. R. 88 (Ezrow Aff. ¶ 8). Because the district court did not explain the basis for its finding that Heard's placement in maximum-security facilities did not implicate a liberty interest, it is unclear whether the district court considered these materials.

---

[4]Heard styled the motion an "affidavit," but it was unsworn.

We conclude that there are material issues of fact that prevent summary judgment on Heard's claim that his confinement to a maximum-security facility implicates a protected liberty interest. Unlike the prisoner in *Harbin-Bey v. Rutter*, 420 F.3d 571, 576-77 (6th Cir. 2005), who challenged only his designation by MDOC officials as an STG member, Heard challenges his placement in maximum-security facilities, coupled with the indefinite nature of this placement and the consequences for his eligibility for parole. It appears that there has been no discovery on these issues. On remand, the district court should permit Heard discovery regarding materials relevant to showing the conditions of his confinement in maximum-security facilities, the nature and timing of review of his maximum-security placement, and the consequences of his placement for parole eligibility. Defendants will, of course, have an opportunity to introduce evidence showing that the conditions of confinement in Michigan's maximum-security facilities are distinguishable from those of the maximum-security prison in *Austin*.

If a prisoner establishes a protected liberty interest, the next question is whether the state afforded the inmate sufficient process. *See Austin*, 545 U.S. at 224. The district court suggested that, even if Heard had a liberty interest, he received sufficient process when he "was called into the Captain's office and his actions were discussed" and when he "received a misconduct hearing and was found guilty" before being designated STG II. R. 143 (Dist. Ct. Op. 2/6/07 at 3). However, on the bare-bones record before us, we cannot say whether Heard received the process that may be due if he has a protected liberty interest. Therefore, if the district court finds on remand that Heard's placement in maximum-security facilities implicates a protected liberty interest, it should then consider whether prison officials have given Heard the process to which he is due under the framework set forth by the Supreme Court in *Austin* and, if so, whether Heard actually received these

11

procedural protections. *See Austin*, 545 U.S. at 224-30 (applying the three factors set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976)).

### 3. First-Amendment-Retaliation Claim—Heard's September 18, 2004 Speech

Heard argues that the district court erred in granting summary judgment in favor of defendants on his claim that prison officials initiated the disciplinary actions against him in retaliation for his exercise of his First Amendment rights in his September 18, 2004 speech. To establish a First Amendment retaliation claim, an inmate must show that (1) he was engaged in protected conduct, (2) an adverse action was taken against him "that would deter a person of ordinary firmness from continuing to engage in that conduct," and (3) there is a causal connection between the first two elements. *Siggers-El v. Barlow*, 412 F.3d 693, 699 (6th Cir. 2005); *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). It is clear that an adverse action was taken against Heard—severe discipline resulting in maximum-security confinement—and that Heard's speech was the cause of this adverse action. The only remaining question therefore is whether Heard's statements during a Nation-of-Islam prayer service constitute speech that is protected by the First Amendment.

The Supreme Court has explained that although "incarceration does not divest prisoners of all constitutional protections," the "constitutional rights that prisoners possess are more limited in scope than the constitutional rights held by individuals in society at large." *Shaw v. Murphy*, 532 U.S. 223, 228-29 (2001). In the specific context of the First Amendment, the Court has stated that "some rights are simply inconsistent with the status of a prisoner or 'with the legitimate penological objectives of the corrections system.'" *Id.* at 229 (quoting *Pell v. Procunier*, 417 U.S. 817, 822 (1974)). Under the "unitary, deferential standard" for reviewing the constitutional claims of

12

prisoners adopted by the Court, a prison regulation that impinges on a prisoner's constitutional rights "'is valid if it is reasonably related to legitimate penological interests.'" *Id.* (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)).

Heard was disciplined for a speech to other inmates in which he, among other things, suggested that those who were mistreated would "strike back," referred to the Fruits of Islam, the paramilitary wing of the Nation of Islam, stated that "the only way to establish peace was through war," and said that "the officers do not want peace." R. 78 Ex. E-A (Therrian Memo 9/18/04). Although Heard's speech was directed at other prisoners, it contained thinly veiled threats against prison guards, suggesting that conflict between guards and prisoners was inevitable and that mistreated prisoners would rise up against the guards. In light of the narrowed scope of the First Amendment in the prison context, we conclude that disciplining Heard for this speech was reasonably related to the legitimate interests of prison officials in maintaining order and ensuring stability in the prison.

The district court dismissed defendants Caruso, Sherry, McQuiggin, and Straub—supervisory prison officials—from Heard's First Amendment retaliation claim because Heard failed to allege that these defendants participated directly or were involved in authorizing policies which violated Heard's First Amendment rights. *See Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984) (explaining that the doctrine of respondeat superior does not apply in § 1983 actions to impute liability onto supervisory personnel, unless the supervisory personnel "encouraged the specific incident of misconduct or in some other way directly participated in it"). Because we affirm the dismissal of this retaliation claim as to all defendants, we need not address this issue.

13

### 4. First-Amendment-Retaliation Claim Against Brown

Heard separately argues that defendant Michael Brown ("Brown"), a corrections officer at Chippewa, retaliated against him for filing an internal grievance challenging his initial major-misconduct citation. According to Heard, Brown designated Heard as a "recruiter"—resulting in Heard's STG II designation—because Heard filed this grievance. The district court granted summary judgment for Brown, finding that defendants had established that Heard's STG II designation "was the result of his conduct and not based upon the filing of a grievance." R. 143 (Dist. Ct. Op. 2/6/07 at 3). In his affidavit, Brown stated that, at the time he participated in designating Heard as STG II, he was unaware of Heard's grievance. Brown further stated that the decision to designate Heard as STG II was based upon an interview that Brown conducted with Heard and the report Brown received from the misconduct hearing, which detailed Heard's statements in the September 18, 2004 speech. Heard did not come forward with any evidence disputing Brown's account, nor did Heard suggest how material uncovered through discovery might support this claim. Accordingly, we conclude that the district court did not err in granting summary judgment for Brown.

### 5. First-Amendment-Retaliation Claim Against Huhta

Heard also asserted a retaliation claim against defendant D. Huhta, a corrections officer at Baraga, alleging that Huhta placed a .40-caliber shell casing in Heard's cell in retaliation for Heard's threat to bring a lawsuit against prison officials. The district court granted summary judgment for Huhta, finding that Heard suffered no adverse action because of this incident and that there was no evidence that Huhta intentionally placed the shell casing in Heard's cell. Summary judgment was properly awarded to Huhta. Even assuming that the shell can be traced to Huhta, Heard pointed to

14

absolutely no evidence that Huhta intentionally placed the shell in Heard's cell or that Huhta was even aware of Heard's plan to file a lawsuit. Further, the discovery requested by Heard with respect to this claim—testing of the shell casing in order to trace it to Huhta's gun—could not create a fact issue as to whether Huhta intentionally placed the shell in Heard's cell or whether Huhta had knowledge of Heard's intent to engage in protected conduct.

### 6. Equal-Protection Claim—STG Designation

Heard argues that his equal-protection rights were violated by his designation as STG II and his attendant placement in maximum-security facilities. According to Heard, prison officials targeted him for STG II designation because he is Muslim and a member of the Nation of Islam. Heard contends that prisoners of other religions who are found guilty of the same offense ("Incite to Riot or Strike") have not received STG II designation. We conclude that district court did not err in granting summary judgment for defendants because Heard has not identified similarly situated non-Nation-of-Islam prisoners who were treated differently. *See Buchanan v. City of Bolivar*, 99 F.3d 1352, 1360 (6th Cir. 1996) ("In opposition to a motion for summary judgment [on an equal-protection claim], it is plaintiff who possesses the burden of demonstrating that the defendants treated similarly situated individuals in a disparate manner."). Again, Heard failed to specify what material he hoped to uncover through discovery to support this claim.

### 7. Equal-Protection Claim—Diet

Heard argues that the district court erred in granting summary judgment for defendants on his claim that his equal-protection rights were violated by prison officials' refusal to (1) provide a diet recommended by the Nation of Islam as set forth in *How to Eat to Live* by Elijah Muhammad, or (2) to provide him with meals under the kosher meal program. Heard alleged that prison officials

accommodated the religious diets of Jewish and Buddhist prisoners but did not accommodate his request for a religious diet. The district court granted summary judgment for the defendants, finding that "MDOC had already made a determination rejecting a Nation of Islam menu years prior to [Heard's] request for a religious diet, because the menu failed to meet dietary requirements." R. 143 (Dist. Ct. Op. 2/6/07 at 5). According to defendant Dave Burnett, MDOC previously had determined that "the combination of foods not allowed [by the Nation-of-Islam diet] would make it impossible to meet nutritional standards." R. 78 Ex. H (Burnett Aff. ¶ 4). Burnett further stated that Heard was denied a kosher diet because, "although the prohibition of blood and the prohibition of swine is common to Muslims, the Nation of Islam and Jews; Muslims and the Nation of Islam are not required to keep [k]osher," and "[k]osher requirements go far beyond the denial of blood and pork." *Id.* ¶ 7. According to Burnett, "Muslims and members of the Nation of Islam can avoid both blood and pork by selecting the non-meat entree from the main meal line." *Id.*

"[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). We have explained that in the prison context "policies infringing on religious rights may be found unreasonable where accommodations are made for others." *Turner v. Bolden*, 8 F. App'x 453, 456 (6th Cir. 2001) (unpublished order). If the defendants can show that the Nation-of-Islam diet requested by Heard fails to meet nutritional standards, we believe that the refusal to provide this diet would be "reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89. The defendants have come forward with some evidence that the Nation-of-Islam diet is nutritionally inadequate—the affidavit of defendant Burnett, who evidently consulted the MDOC documents in which it was determined that the Nation-of-Islam diet was inadequate. However, it appears that

16

Heard has been denied discovery of the MDOC documents and, therefore, denied the opportunity to dispute defendants' evidence.

In his August 15, 2006 supplemental response and attached affidavit, Heard specifically sought discovery of "the document the [MDOC] relied on to determine an Islamic regimen could not meet MDOC required nutritional standards." R. 113 (Heard Supplemental Response 8/15/06 at 5). According to Heard, discovery of this document would show that the Nation-of-Islam diet could meet MDOC nutritional standards and that prison officials were "favoring dietary regiments of [B]uddhist and [J]ewish prisoners over [Heard's] Islamic regimen, because of [f]inancial reasons and for a detrimental effect on . . . Islamic practice." *Id.* The requested document evidently was not produced and is not in the record, and the district court did not respond to Heard's request for discovery of this document.

Because Heard was denied discovery of specific MDOC records that may create a material issue of fact as to whether or not the Nation-of-Islam diet meets MDOC nutritional standards, remand for discovery and further factual findings is appropriate. Accordingly, we vacate this part of the district court's summary-judgment order and remand for further proceedings.

Heard also claims that prison officials should, in the alternative, provide him with kosher meals when Islamic meals are not available. Heard cites to sections of *Islamic Dietary Concepts & Practices* by The Islamic Food & Nutrition Council of America in support of the proposition that Muslims are required to eat kosher meals when Islamic meals are unavailable. *See* R. 163 (Exhibit 4/9/07). However, nothing in the pages cited by Heard supports his contention that Muslims must be given kosher meals when Islamic meals are unavailable, and Heard points to no other evidence that his religion mandates kosher meals. As defendant Burnett explained, kosher requirements far

17

exceed the prohibition of blood and pork, and Muslim and Nation-of-Islam prisoners "can avoid both blood and pork by selecting the non-meat entree from the main meal line." R. 78 Ex. H (Burnett Aff. ¶ 7). Accordingly, the district court did not err in granting summary judgment for defendants as to Heard's claim that he should be accommodated with kosher meals.

### 8. RLUIPA Claim—Diet

Heard also claims that defendants Straub, Burnett, Sherry, and Shaw—all of whom Heard sued in both their individual and official capacities—violated RLUIPA by failing to provide him with a Nation-of-Islam diet or by failing to provide him with a kosher diet. RLUIPA provides:

> [n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—
>
> > (1) is in furtherance of a compelling governmental interest; and
> >
> > (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). If Heard's religion requires adherence to a Nation-of-Islam diet, prison officials' refusal to accommodate this diet would impose a substantial burden. *See, e.g.*, *Al-Amin v. Shear*, No. 08-7681, 2009 WL 971454, at *2-3 (4th Cir. Apr. 10, 2009) (unpublished) (finding that denying kosher ("Common Fare") food to observant Sunni Muslim during Ramadan would be a substantial burden). The defendants would then have the burden of showing that denial of the Nation-of-Islam diet was the least restrictive means of furthering a compelling government interest. As explained above with respect to Heard's equal-protection claim, there remains a material issue of fact as to whether Heard's proposed Nation-of-Islam diet does or does not meet MDOC nutritional

18

standards.  Accordingly, we also vacate the district court's dismissal of Heard's RLUIPA claim and remand for further proceedings.[5]

## B.  Judgment for Masker Following Bench Trial

Heard argues that the weight of the evidence does not support the district court's judgment for Masker on Heard's claim that Masker opened Heard's legal mail outside Heard's presence. Although Heard properly preserved the issue for appeal by moving for a new trial, *see United States v. L.E. Cooke Co.*, 991 F.2d 336, 343 (6th Cir. 1993), a party may not challenge the weight of the evidence to support a trial court's judgment in the absence of a transcript, *see* FED. R. APP. P. 10(b)(2); *Hawley v. City of Cleveland*, 24 F.3d 814, 820-22 (6th Cir. 1994).  A party in a civil proceeding may obtain a transcript at the government's expense if (1) he is granted leave to proceed in forma pauperis on appeal and (2) "the trial judge or a circuit judge certifies that the appeal is not frivolous (but presents a substantial question)."  28 U.S.C. § 753(f).  Heard satisfies the first requirement as the district court granted Heard leave to proceed in forma pauperis on appeal. However, Heard did not ask the district court or this court to certify under 28 U.S.C. § 753(f) that an appeal of the judgment for Masker would not be frivolous.  Instead, on October 27, 2008, Heard submitted to this court a transcript order form on which he indicated that a "[t]ranscript is

---

[5]With respect to Heard's RLUIPA claim against defendants in their *official* capacities, Heard may seek only declaratory or injunctive relief and not monetary relief.  *See Cardinal v. Metrish*, 564 F.3d 794, 798-801 (6th Cir. 2009) (holding that the doctrine of sovereign immunity bars the recovery of monetary damages under RLUIPA when state officials are sued in their official capacities).  This court has not ruled, however, on whether RLUIPA authorizes suits for monetary damages against state officials in their *individual* capacities.  *See Nelson v. Miller*, 570 F.3d 868, 885-89 (7th Cir. 2009) (discussing split of authority on issue; holding that RLUIPA does not subject state officials to suit in their individual capacities).  Because the parties have not briefed this issue and because we are remanding to the district court for further consideration of whether a Nation-of-Islam diet meets MDOC nutritional standards, we decline to decide this issue at this time.

19

unnecessary for appeal purposes." Under these circumstances, we do not consider whether Heard can demonstrate a substantial question for appeal. Without a trial transcript, we are unable to review the evidence before the district court. Accordingly, we must accept the factual findings of the district court as correct and therefore affirm the judgment for Masker.

Additionally, the district court did not abuse its discretion by denying Heard's motion for a new trial because Heard did not come forward with newly discovered evidence or present any other grounds justifying the grant of a new trial. *See Davis ex rel. Davis v. Jellico Cmty. Hosp. Inc.*, 912 F.2d 129, 132 (6th Cir. 1990).

## C.  Other Rulings by District Court

### 1.  Discovery Requests

Heard argues that the district court abused its discretion in denying any discovery and then proceeding to grant summary judgment in favor of defendants. We assume that Heard's August 15, 2006 supplemental response and attached affidavit qualifies as a request for additional discovery pursuant to Federal Rule of Civil Procedure 56(f).[6] We have explained that "[t]ypically, when the parties have no opportunity for discovery, denying the Rule 56(f) motion and ruling on a summary judgment motion is likely to be an abuse of discretion." *CenTra, Inc. v. Estrin*, 538 F.3d 402, 420 (6th Cir. 2008). However, we have also "upheld the denial of Rule 56(f) motions when the court

---

[6]Rule 56(f) provides:
If a party opposing the motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
(1)  deny the motion;
(2)  order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or
(3)  issue any other just order.
FED. R. CIV. P. 56(f).

20

deems as too vague the affidavits submitted in support of the motion," and we have done so "even when the parties were given no opportunity for discovery." *Id.* Further, "we have affirmed the denial of Rule 56(f) motions when the parties were given insufficient time for discovery if further discovery would not have changed the legal and factual deficiencies." *Id.* (internal quotation marks omitted). In the instant case, the district court denied Heard any discovery, except with respect to Heard's claim against Masker, and did not rule on Heard's August 15, 2006 Rule 56(f) motion for discovery.

As explained above in our discussion of Heard's various claims against defendants, Heard failed—except as noted above—to specify in his discovery requests and Rule 56(f) motion what he hoped to uncover through discovery that would have created genuine issues of material fact as to his various claims. Because "further discovery would not have changed the legal and factual deficiencies" of Heard's various claims, we conclude that the district court did not abuse its discretion in denying discovery except as we have previously noted. *Id.* (internal quotation marks omitted).

### 2. Motion to Recuse

The district court did not abuse its discretion by denying Heard's motion to recuse. *See United States v. Jamieson*, 427 F.3d 394, 405 (6th Cir. 2005), *cert. denied*, 547 U.S. 1218 (2006). Heard's motion for recusal was without merit because he presented no evidence that either the magistrate judge or the district judge had any personal bias or prejudice against Heard or in favor of any of the defendants. *See* 28 U.S.C. § 144. Further, Heard did not show that the judges' impartiality could reasonably be questioned. *See* 28 U.S.C. § 455.

### 3. Appointment of Counsel

The district court did not err in denying Heard's motion for appointment of counsel. The appointment of counsel in a civil proceeding is justified only by exceptional circumstances, which are absent in this case. *See Lavado v. Keohane*, 992 F.2d 601, 606 (6th Cir. 1993).

### 4. Class Certification

The district court did not abuse its discretion in declining to certify the class and appoint Heard as class representative. Heard is an incarcerated pro se litigant without legal training who is representing himself and is not able adequately to represent the proposed class. *See* FED. R. CIV. P. 23; *Oxendine v. Williams*, 509 F.2d 1405, 1407 (4th Cir. 1975) ("Ability to protect the interests of the class depends in part on the quality of counsel, and we consider the competence of a layman representing himself to be clearly too limited to allow him to risk the rights of others." (citation omitted)).

### 5. Motion for a Default Judgment

Finally, the district court did not abuse its discretion in denying Heard's motion for a default judgment pursuant to FED. R. CIV. P. 55. The district court denied defendants' motion to dismiss on August 22, 2006, but Masker did not file an answer until March 26, 2007. On April 2, 2007, Heard filed a motion for a default judgment, citing Masker's failure to file a timely answer. The district court denied Heard's motion on April 25, 2007, stating that "[d]efault was never entered in this case." R. 165 (Order 4/25/07). "Prior to obtaining a default judgment under either Rule 55(b)(1) or Rule 55(b)(2), there must be an entry of default as provided by Rule 55(a)." 10A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2682, at 13 (3d ed. 1998). Rule 55(a) provides that "[w]hen a party against whom a judgment for affirmative relief is sought

22

has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." FED. R. CIV. P. 55(a). Because Heard did not first seek entry of a default from the clerk of the court, it was procedurally improper for Heard to move for entry of a default judgment.

### III.  CONCLUSION

For the reasons discussed above, we **VACATE** the district court's grant of summary judgment for defendants on Heard's procedural-due-process claim and **REMAND** for further proceedings.  We also **VACATE** the district court's grant of summary judgment for defendants on Heard's equal-protection and RLUIPA claims challenging the refusal to provide Heard with a Nation-of-Islam diet and **REMAND** for further proceedings.  The judgment of the district court is **AFFIRMED** in all other respects.